UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

CREATIVE WASTE MANAGEMENT, INC., :

                 Plaintiff, :

                                      04 Civ. 9581 (WCC)

         - against - :

CAPITOL ENVIRONMENTAL SERVICES, INC., :
CODE ENVIRONMENTAL SERVICES, INC. and
CITY OF NEW ROCHELLE, NEW YORK, :

                 Defendants. :

- - - - - - - - - - - - - - - - - - - X         **OPINION**

CITY OF NEW ROCHELLE, :         **AND ORDER**

                  Plaintiff, :

         - against - :

FIDELITY AND GUARANTY INSURANCE COMPANY :
and UNITED STATES FIDELITY AND GUARANTY
COMPANY, :

                 Defendants. :

- - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                              DOLCHIN, SLOTKIN & TODD, P.C.
**Attorneys for Plaintiff
   Creative Waste Management, Inc.**
One Commerce Square
2005 Market Street, 24th Floor
Philadelphia, Pennsylvania 19103

JOEL W. TODD, ESQ.

       Of Counsel

                              LAW OFFICES OF JOEL B. ALBERT, P.C.
**Attorneys for Defendant Capitol
   Environmental Services, Inc.**
Two Bala Plaza, Suite 300
Bala Cynwyd, Pennsylvania 19004

JOEL B. ALBERT, ESQ.

       Of Counsel

                 **Copies Mailed to Counsel of Record_____**

**A P P E A R A N C E S :  (continued)**

                                        WILSON, ELSER, MOSKOWITZ, EDELMAN
                                          & DICKER, LLP
                                        **Attorneys for Defendant**
                                          **Code Environmental Services, Inc.**
                                        The Curtis Center
                                        Suite 1130E
                                        Philadelphia, PA 19106

JONATHAN DRYER, ESQ.

        Of Counsel

                                        WILSON, ELSER, MOSKOWITZ, EDELMAN
                                          & DICKER, LLP
                                        **Attorneys for Defendant**
                                          **City of New Rochelle**
                                        Three Gannett Drive
                                        White Plains, New York 10604

PETER A. MEISELS, ESQ.
LALIT K. LOOMBA, ESQ.

        Of Counsel

                                        WOLF & SAMSON PC
                                        **Attorneys for Fidelity and Guaranty**
                                          **Insurance Company**
                                        The Office at Crystal Lake
                                        One Boland Drive
                                        West Orange, New Jersey 07052

ADAM P. FRIEDMAN, ESQ.

        Of Counsel

**CONNER, Senior D.J.:**

Plaintiff Creative Waste Management, Inc. ("Creative") brings the instant action against defendants Capitol Environmental Services, Inc. ("Capitol") and Code Environmental Services, Inc. ("Code") for breach of contract and promissory estoppel, and against the City of New Rochelle, New York ("New Rochelle" or the "City") (collectively, the "defendants") for fraudulent inducement, breach of implied covenant, mutual mistake, unilateral mistake and fraud and negligent misrepresentation (the "main action"). Capitol brings cross-claims against Code and New Rochelle for contribution and indemnification, and Code brings a cross-claim against Capitol for contribution and indemnification. Code also brings counterclaims against Creative for breach of contract and unjust enrichment. New Rochelle brings a counterclaim against Creative for breach of contract. In addition, New Rochelle has commenced a related action against Fidelity and Guaranty Insurance Company and United States Fidelity and Guaranty Company (collectively the "Surety") for breach of contract, which has been consolidated before this Court (the "consolidated action").

In the main action, defendants all move for summary judgment on Creative's claims. In addition, Code moves for summary judgment on its counterclaim against Creative, and New Rochelle moves for summary judgment on Capitol's cross-claim. New Rochelle also seeks partial summary judgment on the issue of liability against Creative and the Surety on its breach of contract claims. Also, Creative moves to amend its Complaint to allege compliance with New York General Municipal Law § 50-e.

In light of the complexity of this lawsuit, the various claims, counterclaims and cross-claims and the multiple motions for summary judgment, the Court has constructed the following chart for ease of reference.

1

| Party Suing → Party Sued | Cause(s) of Action | Moving Party |
|---|---|---|
| Creative → Capitol | 1) Breach of Contract<br>2) Promissory Estoppel | Capitol |
| Creative → Code | 1) Breach of Contract<br>2) Promissory Estoppel | Code |
| Creative → New Rochelle | 1) Fraudulent Inducement<br>2) Breach of Implied Covenant of Good Faith<br>3) Mutual Mistake<br>4) Unilateral Mistake<br>5) Fraud<br>6) Negligent Misrepresentation | New Rochelle |
| Capitol → Code (cross-claim) | 1) Contribution<br>2) Indemnification | |
| Capitol → New Rochelle (cross-claim) | 1) Contribution<br>2) Indemnification | New Rochelle |
| Code → Creative (counterclaim) | 1) Breach of Contract<br>2) Unjust Enrichment | Code |
| New Rochelle → Creative (counterclaim) | 1) Breach of Contract | New Rochelle for partial summary judgment (on liability) |
| New Rochelle → Surety (related action) | 1) Breach of Contract | New Rochelle for partial summary judgment (on liability) |

For the reasons stated herein, Capitol's motion against Creative is granted in part, denied in part; Code's motion against Creative is granted in part, denied in part; and New Rochelle's motion against Creative is granted in part, denied in part. Code's motion on the counterclaim against Creative is denied. New Rochelle's motion for partial summary judgment on its counterclaim against Creative is denied, as is its motion against the Surety. Capitol's motion for summary judgment on its cross-claim against New Rochelle is also denied. Creative's motion to amend its

Complaint is denied.

## BACKGROUND

### I.    Factual Allegations

New Rochelle, located on the north shore of Long Island Sound (the "Sound"), operates the New Rochelle Municipal Marina (the "Marina"), which is located where Ferris Creek meets the Sound, an area commonly referred to as Echo Bay.[1]  (New Rochelle Rule 56.1 Stmt. ¶¶ 7, 8.)  This case arises out of contract disputes regarding a project of the City to dredge sediment from the Sound floor in the area in and around the Marina (the "Project").

### A.    The Dredging Plan and Government Approval

The City retained Daniel Natchez & Associates ("Natchez")  to plan and obtain regulatory approval for the Project.  (Natchez Dep. at 27-28.)  Natchez's proposal plan called for mechanical dredging and open water disposal of dredged material.  (New Rochelle Rule 56.1 Stmt. ¶¶ 11, 24; Pl. 3/10/06 Rule 56.1 Stmt. ¶ 15.)  Plan approval had to be obtained from the New York State Department of Environmental Conservation ("NYDEC"), the Connecticut Department of Environmental Protection ("CTDEP") and the United States Army Corps of Engineers ("USACE"). (Clemente Aff. ¶¶ 9, 12, 15.)  To obtain regulatory approval, certain tests with respect to grain size and bulk sediment needed to be performed.  (Natchez Dep. at 28.)  In October 1996, Natchez

---

[1] Each defendant has submitted a Rule 56.1 Statement.  These statements are herein cited as "[Defendant] Rule 56.1 Stmt. ¶ ___."  Plaintiff submitted three Rule 56.1 statements in response to each defendant's statement.  Plaintiff's statements are cited with reference to the date each statement was signed, such as "Pl. [Date] Rule 56.1 Stmt. ¶ ___."

collected four core samples of bottom sediment to determine its chemical and physical characteristics (the "1996 tests").[2] (Clemente Aff. ¶ 11.) Natchez then selected laboratories to perform the analysis of the samples and provide the results to the regulatory agencies. (Natchez Dep. at 28.) Natchez then filed an application for the Project on behalf of the City with NYDEC, which issued a permit for the Project on July 15, 1997. (New Rochelle Rule 56.1 Stmt. ¶¶ 14, 15; Pl. 3/10/06 Rule 56.1 Stmt. ¶ 15.)

On November 4, 1997, the EPA sent a letter to USACE requesting additional testing of the sediment. (Natchez Dep., Ex. N-7.) This was followed by a November 5, 1997 letter from CTDEP to USACE requesting the same. (*Id.*) Apparently, both agencies expressed concern with dioxin levels in the sediment, and indicated bioassay testing would have to be performed prior to the issuance of any permits.[3] (*Id.*) Plaintiff, relying on Daniel Natchez's deposition testimony, asserts that the initial testing of the dredged material revealed elevated metal levels of concern to the New York State Department of State. (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 16.) However, USACE did not request that Natchez perform further testing based on the concerns raised in the letters sent by EPA and CTDEP until October 2000.[4] (Natchez Dep. at 96-98, Ex. N-15.) Seven samples were collected by Natchez and were sent for analysis in December 2000 (the "2000 tests"). (Clemente Aff. at ¶ 14.) The results were submitted to USACE. (*Id.*; New Rochelle Mem. Supp. Mot. Summ. J., Ex. 5.)

---

[2] Creative does not deny that these samples were taken. However, they maintain that New Rochelle did not fully disclose to Creative the results of these tests. (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 12.)

[3] Bioassay testing involves a series of experiments using living organisms to test the toxicity of chemicals.

[4] It is not clear why USACE took three years to request additional testing.

Based on these results, Natchez determined that upland disposal of the dredged material would not be logistically or economically feasible because the dredged material was not suitable for unconfined open water disposal. (Natchez Dep. at 38.) Due to various concerns and the likely need for further testing in view of the 2000 test results, the City decided to pursue an alternative dredging plan.[5] (New Rochelle Rule 56.1 Stmt. ¶¶ 20-22; Clemente Aff. ¶¶ 17-19.)

Charles Pound, president of Aqua Dredge, Inc. ("Aqua Dredge"), contacted the City by letter dated July 10, 2001 and proposed a "more cost effective and efficient" hydraulic dredging plan with upland disposal of the dredged material. (New Rochelle Rule 56.1 Stmt. ¶¶ 22, 24; New Rochelle Mem. Supp. Mot. Summ. J., Ex. 7.) Pound subsequently was retained by the City to design a dredging project and to obtain the necessary government permits.[6] (New Rochelle Rule 56.1 Stmt. ¶ 26.)

On August 22, 2001, Pound faxed NYDEC the results from the 2000 tests. (*Id.* ¶ 28; Pl. 3/10/06 Rule 56.1 Stmt. ¶ 28.) The City and NYDEC met on August 28, 2001 to discuss the requirements for approval of the new plan.[7] (New Rochelle Rule 56.1 Stmt. ¶¶ 27, 29; Pl. 3/10/06

---

[5] The City indicates that the additional testing would cost in excess of $300,000, and that at this price such testing was not worth pursuing since it would not guarantee that the Project would receive the necessary regulatory approvals. (New Rochelle Rule 56.1 Stmt. ¶¶ 18, 20; Clemente Aff. ¶ 17.) Creative does not deny that this testing was performed, but asserts that the 2000 tests detected PCBs and dioxins in the Marina, and that the full results were given to New Rochelle. (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 16.) It was only after learning these results that the City, according to Creative, abandoned the open water disposal plan. (*Id.*)

[6] The alternative plan reduced the removed sediment below 25,000 cubic yards, thereby avoiding the need for dioxin testing. According to Creative, the decision to abandon Natchez's open water disposal plan occurred after New Rochelle reduced the amount of material to be removed a second time. (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 16.)

[7] Plaintiff asserts that in addition to meeting on August 28, 2001, meetings also took place on January 12, 2002 and March 27, 2002. (Pl. 3/10/06 Rule 56.1 Stmt. ¶27.)

Rule 56.1 Stmt. ¶ 27.) After the meeting, Pound provided NYDEC with a list of available disposal sites in New Jersey and Pennsylvania willing to accept the dredged sediment and provided these disposal facilities with the 2000 test results. (Pound Dep. at 62-65.) The City submitted a permit application to NYDEC for the new dredging Project on March 22, 2002. (New Rochelle Rule 56.1 Stmt. ¶ 32.) The City supplemented this application by providing NYDEC with a confirmed list of upland disposal sites willing to accept the dredged materials. The application was accepted on October 7, 2002. (*Id.* ¶ 35.)

The permit's "Description of Authorized Activity" section states: "Hydraulically dredge approximately 30,000 cubic yards of sand, silt and sediment from the New Rochelle Municipal Marina. The sediment will be dewatered by using vacuum belt presses following which it will be trucked to one or more disposal sites in New Jersey and/or Pennsylvania." (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 12.) USACE issued a similar permit on March 31, 2000 allowing the City to "[t]ruck the dewatered material to one or more State-approved disposal sites in New Jersey and/or Pennsylvania." (*Id.*, Ex. 13.) The period for dredging was limited to October 1, 2003 through January 31, 2004. (*Id.*)[8]

### B.    The Bidding Process

After obtaining regulatory approval, the City prepared a package of information regarding the specifications of the dredging for prospective project bidders (the "bid package") and invited

---

[8] The parties have not indicated whether approval was ever obtained from CTDEP; however, this approval is not determinative in this case.

contractors to bid on the project.[9]  (New Rochelle Rule 56.1 Stmt. ¶ 37.)  The bid package, prepared

by Pound and John Clemente, the New Rochelle City Engineer, contained various forms and

included environmental testing results from the 1996 tests, but not from the 2000 tests.[10]  (New

Rochelle Rule 56.1 Stmt. ¶¶ 37-39; Pl. 3/10/06 Rule 56.1 Stmt. ¶ 38.)

A mandatory pre-bid meeting for all prospective project bidders took place on June 19, 2003.

(New Rochelle Rule 56.1 Stmt. ¶ 41.)  Present at this meeting were Marc Petroski, who, at the time,

was an employee of Creative, and Kaz Orszulik, an engineer at the New Rochelle Department of

Public Works.  (*Id.* ¶¶ 42, 43.)  Orszulik allegedly told those present that bidders should expect "to

encounter significant debris" during the dredging project because it was a municipal marina.  (*Id.*

¶ 45.)  Petroski denies that this statement was made.  (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 45.) After the

meeting, Orszulik allegedly faxed the list of potential disposal sites to the potential bidders present

at the pre-bid meeting.  (*Id.* ¶¶ 46, 47.)  Creative and Petroski deny ever receiving this list and,

therefore, never contacted any of the companies listed regarding dredging disposal.  (Pl. 3/10/06 Rule

56.1 Stmt. ¶¶ 46, 47, 48; Pl. Mem. Opp. Capitol Mot. Summ. J., Ex. H.)

Creative did, however, contact Clean Earth Dredging Technologies, Inc. ("Clean Earth"), a

dredge disposal vendor, to obtain prices for transportation and disposal of dredged material prior to

submitting its bid.  (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 49; New Rochelle Mem. Supp. Mot. Summ. J.,

---

[9] The deadline to submit bids was July 2, 2003.  (New Rochelle Rule 56.1 Stmt. ¶ 54.)

[10] One of the forms was a bid form (the "bid form"), which required contractors to specify separate quotes for the costs of: (1) mobilization and demobilization; (2) dredging; (3) dewatering; (4) loading and transportation; and (5) legal disposal of dry material.  (*Id.*)  In addition, the bid form contains the following language: "All information shown on the plans or in the specifications is representative of the conditions at the time of preparation.  Bidder is advised to inspect the site to verify the existing conditions."  (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 22.)

Ex. 18 at 29.) Clean Earth gave Creative a preliminary quote of $56 per ton for transporting and disposing the dredged material. (Pl. 3/10/06 Rule 56.1 Stmt. ¶ 50.) Creative used this price in calculating its bid to the City, but hoped to find a less expensive disposal company. (Pl. 3/1/06 Rule 56.1 Stmt. ¶ 6.)

Creative submitted its bid form on July 1, 2003. Its bid estimated $415,635 for mobilization and demobilization, $596,100 for dredging, $718,800 for dewatering, $364,000 for loading and transportation and $1,092,000 for legal disposal of dry material, for a total bid estimate of $3,186,535. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 22.) The City and Creative agreed to reduce the total bid estimate to $2,000,000 to reflect a reduction in the amount of material to be dredged from 30,000 cubic yards to 17,000 cubic yards. (New Rochelle Rule 56.1 Stmt. ¶¶ 59, 61.) The City accepted Creative's bid by letter dated July 18, 2003, with the understanding that Creative was to obtain the required insurance, performance and labor-material bond coverage. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 25.) Creative obtained a surety bond from the Surety on July 28, 2003 in the amount of two million dollars. (*Id.*, Ex. 36.)

### C. The Contract between the City and Creative

On August 28, 2003, Creative and New Rochelle executed a contract for the dredging project (the "contract"). (*Id.*, Ex. 14.) The contract contained several provisions with respect to Creative's duty to inspect existing conditions at the Marina. Specifically, the contract reads: "Contractors are particularly requested to examine the plans and specifications and location of the work before bidding." (*Id.*, Ex. 14, Section A, I(b), at A-1.) In addition, the contract provides, "The Contractor shall take all responsibility of the work; the said Contractor shall bear all losses resulting to said

Contractor on account of the amount or character of the work, or because the nature of the land in or on which the work is done is different from that assumed or expected, or on account of the weather, floods or other causes." (*Id.*, Section C, III(b), at C-16.) In submitting bids, contractors were required to submit estimates on the condition that:

> Bidders must satisfy themselves, by a personal examination of the location of the proposed work and/or by such other means as they may prefer, as to the actual conditions and requirements of the work and the accuracy of the foregoing estimate of the Engineer and shall not at any time after submission of a bid assert or claim that there was any misunderstanding in regard to the nature of the work or the conditions affecting the work.

(*Id.*, Section A, I(g), at A-2 to A-3.)

> The contract also provided provisions with respect to notice of changed conditions:

> If the Contractor shall claim compensation for any damages sustained by reason of the acts of the Commissioner of Public Works, or his agents, said Contractor shall, within five days after the sustaining of such damage, make a written statement of the nature of the damage sustained, to the Engineer. On or before the fifteenth day of the month succeeding that in which any such damage shall have been sustained the Contractor shall file with the Engineer an itemized statement of the detail and amount of such damage and unless such statement shall be made as thus required, said Contractor's claim for compensation shall be forfeited and invalidated, and the said Contractor shall not be entitled to payment on account of such damage.

(*Id.*, Section C, IV(n), at C-28 to 29.) The contract also had a provision for "extra work" and "additional work." (*Id.*, Section C, IV(d) at C-22 to 23.)

> "Extra Work and/or Materials," as herein used, shall mean work that forms an essential part of the job but which was not anticipated at the time when the plans and specifications were prepared and is not capable of being classified under any Contract Items.

> "Additional Work and/or Materials," as herein used, shall mean work capable of being classified under any Contract Items in addition to that originally contemplated (and estimated), payable for at unit prices bid.

> "Extra Work" and "Additional Work" shall be performed in accordance with

9

applicable provisions of the Contract specifications, or, if no applicable specifications are contained in the Contract, under such specifications as may be specially established by the Engineer.

(*Id.*) In the event "extra work" arose, "Creative was required to provide advance written notification to the Engineer of its proposed compensation to perform the extra work." (*Id.*) Under the contract, all notice must be in writing. (*Id.*, Section C, I(b)(13), at C-1.) The contract provided that "time is of the essence" and all dredging and dewatering "must be completed by the expiration date of the Permit period to assure availability of the entire marina for the 2004 season." (*Id.*, Section G, ¶ 1.8, at TS-6.)

### D.   Capitol and Code

After Creative submitted its bid to the City, it sought bids for transportation and disposal of the dredged material based on the price quotation it received from Clean Earth. (Pl. 3/1/06 Rule 56.1 Stmt. ¶ 15.) Capitol is primarily in the business of transportation and disposal. (Albanese Dep. at 16.) Creative and Capitol discussed the dredging project in July 2003. (Capitol Rule 56.1 Stmt. ¶ 20.) Before Capitol would provide a price quotation, it sought from Creative additional information regarding the Marina sediment and its disposal. (*Id.* ¶ 17.) Creative provided Capitol with the results from the 1996 tests. (*Id.* ¶ 18.) However, Capitol asserts that they were never provided with the remaining contract documents, including copies of the permits specifying that the dredged material must be disposed only in New Jersey or Pennsylvania. (*Id.* ¶ 18.) Creative asserts that they provided Capitol with this information and that Capitol was aware of the disposal site location requirements. (Pl. 3/1/06 Rule 56.1 Stmt. ¶¶ 18, 19, 24, 25.)

In any event, Capitol contacted Transmine Inc. ("Transmine") located in Westhampton

Beach, New York, which gave Capitol a quote of $24.90 per ton to transport and dispose of up to 20,000 tons of sediment from the Marina to its NYDEC-approved site. (Capitol Rule 56.1 Stmt. ¶ 19.) Relying on this price, Capitol provided a quote to Creative of $29.75 per ton for the transportation and disposal of 15,000 tons of sediment. (*Id.* ¶ 20.) Capitol expressly indicated in its quote that the sediment must meet the parameters of acceptance set by the disposal facility. (*Id.*) To ensure acceptance by Transmine, Capitol directed Creative to conduct current chemical analysis on the Marina sediment rather then rely on the 1996 test results. (*Id.* ¶ 20.) On July 21, 2003, new chemical testing was conducted and the results were sent to Capitol on August 14, 2003 (the "2003 tests"). (*Id.* ¶ 22.) On September 2, 2003, Transmine, by letter, agreed to accept the sediment from the Marina for disposal (the "Sept. 2, 2003 Transmine letter"). (*Id.* ¶ 23.) Capitol faxed a copy of this letter to Creative, who, in turn, forwarded a copy to New Rochelle. (*Id.* ¶ 24; Pl. 3/1/06 Rule 56.1 Stmt. ¶ 24.) Both Capitol and Transmine believed that they would need to obtain a separate permit from NYDEC in order to accept the dredged sediment from the Marina, but, because its disposal site was in New York, thought it likely that such a permit would be issued because NYDEC had issued another disposal permit to Transmine in an unrelated project in New York.[11] (Capitol Rule 56.1 Stmt. ¶ 24.)

In addition to contacting Capitol, Creative also sought price quotations from Code, another transportation and disposal provider. (*Id.* ¶ 26.) Code submitted a proposal for the Project to Creative by letter dated Sept. 3, 2003 (the "Sept. 3, 2003 proposal"). (Code Mem. Supp. Mot.

---

[11] The deposition testimony of Russell Pinkerton, of Creative, and Dan Albanese, of Capitol, are in direct conflict over whether Capitol was informed of the site disposal requirement, and, if so, when. (Pinkerton 5/18/05 Dep. at 39-40, 45-47; Pinkerton 5/19/05 Dep. at 145-47; Pinkerton 9/6/05 Dep. at 31, 47-48; Albanese Dep. at 31-33.)

Summ. J., Ex. D.)  This proposal, for the transport and disposal of 20,000 tons of "stabilized dredge sediments," quoted a price of $36.25 per ton for the transportation and disposal of the material at a Pennsylvania facility and $40.00 per ton at a New Jersey facility.  (*Id.*)  The letter indicated that the Sept. 3, 2003 proposal was based on certain "Planning Assumptions," one of which was that "[w]aste approval will be based on facility acceptance."  (*Id.*)  Code asserts, and plaintiff refutes, that the disposal of the Marina material was conditioned on acceptance by the disposal facility.  (Code Rule 56.1 Stmt. ¶¶ 7, 8; Pl. 2/22/06 Rule 56.1 Stmt. ¶¶ 7, 8.)

Code required further testing of the material before it could continue with the Project, so Creative provided Code with the 2003 test results.  (Pl. 2/22/06 Rule 56.1 Stmt. ¶ 10; Code Rule 56.1 Stmt. ¶ 9.)  Code, through its broker, the Alliance Companies ("Alliance"), arranged for the transportation of the sediment through Rainbow Transportation ("Rainbow").  (Code Rule 56.1 Stmt. ¶ 6.)  On September 4, 2003, Donna Root, Director of Operations at Alliance, informed Code by letter that it had located a disposal site at its Coplay Quarry ("Coplay") (the "Sept. 4, 2003 Alliance letter").[12]  (Code Mem. Supp. Mot. Summ. J., Ex. E.)  At some point, Alliance secured an additional disposal facility in Bethlehem, Pennsylvania operated by American Soil & Mulch, Inc. ("AS&M").[13]  (Pantaleo Dep at 121-22.)  Creative submitted to Code a work order on October 9, 2003 authorizing

---

[12] The letter referred to facility acceptance of  "marina mud."  (Code Mem. Supp. Mot. Summ. J., Ex. E.)  Code maintains, and Creative denies, that their contract was for disposal of "marina mud."  Creative asserts that the contract was for "dewatered dredge material."  (Pinkerton 5/18/05 Dep. at 300-301.)

[13] Code indicates in the fact section of its Memorandum of Law in Support of its Motion for Summary Judgment that "Code's agreement for transportation and disposal of the material was expressly conditioned upon its acceptance at two specific disposal facilities, Coplay Quarry and American Soil and Mulch, both located in the state of Pennsylvania."  (Code Mem. Supp. Mot. Summ. J. at 2-3.)  No support for this assertion is offered, and nowhere else is it explained how AS&M became involved in this Project.

Code to transport 2,500 tons of dewatered dredged material pursuant to the Sept. 3, 2003 proposal. (Code Reply Mem. Supp. Mot. Summ. J., Ex. E.)

On September 9, 2003, Pinkerton, Vice President of Creative, faxed to Clemente "acceptance letters" from disposal sites. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 41.) These letters were the Sept. 2, 2003 Transmine letter and the Sept. 4, 2003 Alliance letter. (*Id.*) In addition, Pinkerton, on September 11, 2003, faxed to Clemente what was purportedly the Pennsylvania Department of Environmental Protection ("PADEP") permit for the Coplay site. (*Id.*, Ex. 42.) Enclosed were two letters: (1) a December 19, 1995 letter from PADEP to Coplay granting permission to Coplay "to import clean, uncontaminated materials to the reference operation for disposal" (the "Dec. 19, 1995 PADEP letter"); and (2) a January 24, 2003 letter from PADEP for AS&M providing a "draft" residual waste permit "to create mulch for commercial purposes." (*Id.*) However, it is undisputed that none of the dredged material was ever disposed of at the Coplay facility and that Creative never provided the City with a copy of the actual permit issued by PADEP for AS&M's Bethlehem location. (New Rochelle Rule 56.1 Stmt. ¶¶ 118, 119; Pl. 3/10/06 Rule 56.1 Stmt. ¶¶ 118, 119.)

The City forwarded the Sept. 2, 2003 Transmine letter to NYDEC and USACE on September 19, 2003. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 43.) In addition, the City faxed the Dec. 19, 1995 PADEP letter and the Sept. 4, 2003 Alliance letter to NYDEC and USACE on October 1, 2003. (*Id.*, Ex. 44.) Copies of both faxes were sent to Creative. (*Id.*, Exs. 43, 44.) On October 28, 2003, NYDEC rejected the Transmine disposal site for Marina material but authorized the AS&M site. (*Id.*, Ex. 45.)

### E.    The Project Commences

Mobilization for the Project began on September 15, 2003, and was completed October 14, 2003, just prior to disposal site approval by NYDEC.[14]  (New Rochelle Rule 56.1 Stmt. ¶¶ 108, 109.) Dredging began on October 16, 2003.  (*Id.* ¶ 123.)  From October 16, 2003 to October 31, 2003 approximately 531 tons of dried Marina sediment was transported by Creative to the AS&M site. (*Id.* ¶¶ 125, 127; New Rochelle Mem. Supp. Mot. Summ J., Ex. 46.)

In October 2003, PADEP inspected the AS&M site.  (Code Rule 56.1 Stmt. ¶ 10.) Apparently, AS&M's permit did not allow it to accept dredged material that PADEP defined as "residual waste."  (*Id.* ¶ 12; Pl. 2/22/06 Rule 56.1 Stmt. ¶¶ 12, 13.)  On October 31, 2003, PADEP issued notices of violation to the AS&M site and Angelo Villani, individually as one of the owners of the AS&M site, because AS&M was accepting "residual waste."  (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 48.)  Creative attempted to continue the dredging in November but, without another disposal site, it had no place to store the removed sediment, and was forced to cease dredging after November 11, 2003.  (Harris Dep. at 59-60, 69-70, 80-82.)

Creative, along with Code, attempted to locate another facility, and again contacted Clean Earth as a potential disposal site.  (Code Rule 56.1 Stmt. ¶ 14.)  Clean Earth agreed to accept the material for processing at its Claremont Dredge Material Processing Facility, with disposal at its FDP Enterprises facility, both located in New Jersey.  (*Id.* ¶ 140.)  Clean Earth obtained the approval of the New Jersey Department of Environmental Protection on November 24, 2003, but the facility could not accept the sediment until December 3, 2003.  (*Id.* ¶¶ 142, 143.)  In the interim, the City

---

[14] According to the contract, mobilization was suppose to have been completed by October 1, 2003.  (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 14.)  No party asserts this constituted a material breach.

sent Creative a letter dated November 24, 2003 indicating that Creative failed to maintain the schedule for dredging and failed to comply with the terms of the parties' contract. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 55.) Creative responded by letter dated December 1, 2003, stating that they were not "responsible for delays, caused by third parties, which are outside [their] control." (*Id.*, Ex. 56.)

On December 1, 2003, Creative contracted with both Rainbow, to transport the Marina sediment, and Clean Earth, to dispose of the Marina sediment. (*Id.*, Exs. 57, 58.) Dredging recommenced on December 3, 2003, but was discontinued in early January 2004 because of extremely cold temperatures. (*Id.*, Ex. 51; New Rochelle Rule 56.1 Stmt. ¶¶ 152, 153.) At the time the dredging stopped again, Creative had removed 5,963 cubic yards of material from the Marina. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 61.) Creative sought progress payments from the City on October 8, 2003; December 1, 2003; December 15, 2003; December 31, 2003; January 5, 2004; March 9, 2004; and March 15, 2004. (*Id.*, Ex. 62.) Creative was paid each time with the exception of the last payment request on March 15, 2004. (New Rochelle Rule 56.1 Stmt. ¶ 158.)

One of the main issues of contention between Creative and the City involves a bubbler system that was installed in the late 1960's (the "bubbler system"). (*Id.* ¶ 160; New Rochelle Mem. Supp. Mot. Summ. J., Ex. 63.) The bubbler system was designed to prevent ice from forming in the Marina during the winter months. (New Rochelle Rule 56.1 Stmt. ¶ 160.) Apparently, the bubbler system has not been operational for over 25 years and, at the time of bidding on the dredging project, no one from the City could remember when the bubbler system had last been operational or even what components made up the system, although some of its components are visible around the Marina. (*Id.* ¶¶ 161, 162, 163.)

Creative asserts that the bubbler system prevented it from completing the dredging on time, because it clogged the augur head and pumping system and that it informed Sal Gugliara, the New Rochelle Harbor Master, of the bubbler system problem.[15] (Pl. 3/10/06 Rule 56.1 Stmt. ¶¶ 164, 166, 167.) Gugliara apparently attempted to remove parts of the system, but was unsuccessful. (*Id.*) However, Creative did not provide written notice to the City regarding the bubbler system problem until January 5, 2004, when the system was cited as a changed condition justifying an increase from the initial contract price. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 64.)

## II.   Procedural History

Creative commenced its action against Capitol and Code on March 11, 2004 in the United States District Court for the Eastern District of Pennsylvania (the "Pennsylvania action"). (New Rochelle Rule 56.1 Stmt. ¶ 181.) On May 20, 2004, plaintiff sent an unsworn letter to the City's Corporation Counsel purporting to be a notice of claim for breach of contract and/or fraudulent inducement under New York Court of Claims Act § 10. (*Id.* ¶ 183.) The City then advised Creative on April 28, 2004 that it would call the Surety Bond unless Creative made plans to complete the job. (*Id.* ¶ 184.) The City called the Surety Bond on June 4, 2004. (*Id.* ¶ 185.)

Creative filed an amended complaint in the Pennsylvania action to assert a claim against the City for fraudulent inducement and breach of covenant. (*Id.* ¶ 187.) The City moved to dismiss the claims against it in the Pennsylvania action or, in the alternative, to transfer the action to the United States District Court for the Southern District of New York. (*Id.* ¶ 188.) The City's motion to

---

[15] Creative apparently spoke with Gugliara, but it is not clear when that conversation occurred. (Gugliara Dep. at 13, 26.)

transfer the action was granted, and the case was assigned to this Court.  (*Id.* ¶ 189.)

The City filed an action in New York Supreme Court, Westchester County against the Surety for breach of contract.  (*Id.* ¶ 190.)  The action against the Surety was removed to federal court and assigned to this Court as related to the main action.  (*Id.* ¶ 191.)  The main action and the related action were consolidated by Stipulation and Order dated June 1, 2005.[16]  (*Id.* ¶ 194.)

## DISCUSSION

### I.    <u>Motion for Summary Judgment Standard</u>

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c)); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 248.  The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

---

[16] This Court has jurisdiction based on diversity pursuant to 28 U.S.C. § 1332(a).

## II.    Capitol's Motion

### A.    Promissory Estoppel

Creative concedes that it cannot maintain a claim for promissory estoppel against Capitol based on its allegation that Creative "'made binding contract commitments to the City of New Rochelle in justifiable reliance on the oral and written statements that . . . Capitol . . . would be able to handle the transportation and disposal . . . of dewatered dredge material from the New Rochelle Project.'" (Pl. Mem. Opp. Capitol Mot. Summ. J. at 5 (citing 2d Am. Complt. ¶ 35).)  However, Creative asserts that it can maintain an action for promissory estoppel against Capitol based on its allegation that "'[i]n justifiable reliance on the oral and written statements that . . . Capitol . . . would be able to handle the transportation and disposal . . . of dewatered dredge material from the New Rochelle Project, Creative refrained, to its detriment, from soliciting proposals from other firms regarding transportation and disposal . . . of dewatered dredge material from the New Rochelle Project.'"  (Pl. Mem. Opp. Capitol Mot. Summ. J. at 6 (citing 2d Am. Complt. ¶ 36).)

Under New York law,[17] to state a claim of promissory estoppel a plaintiff must demonstrate:

_____

[17] As a federal court sitting in diversity, we must apply the choice of law rules of the forum state, *i.e.*, New York. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538 (2d Cir. 1997).  In determining which state law to apply in contract cases, New York applies the "center of gravity" or "grouping of contacts" approach. *Id.* at 1539.  "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Id.*  In tort claims, New York courts use the "interest analysis" test, "which gives 'controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" *Hughes v. LaSalle Bank, N.V.*, No. 02 Civ. 6384, --- F. Supp. 2d --- , 2006 WL 620654, at *9 (S.D.N.Y. Mar. 13, 2006) (citing *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 612 N.E.2d 277, 595 N.Y.S.2d 919 (1993)) (internal quotation marks omitted).  Under either analysis, it is clear that New York has the most significant contacts and interest in the suit.  This was illustrated in the Eastern District of Pennsylvania's opinion transferring the case to this District.  *See Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, No. 04 Civ. 1060, 2004 WL 2384991, at *5 (E.D. Pa. Oct.

"a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reasons of his reliance." *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir. 1986)).

Here, there was a clear promise to "[p]rovide transportation and disposal of the Dredge Material for New Rochelle Municipal Dredging Project." (Capitol Reply Mem. Supp. Mot. Summ. J., Ex. B.) However, Creative cannot demonstrate that, in reliance of this promise, it refrained from soliciting proposals from other disposal companies. Indeed, Creative sought quotes from Clean Earth, Capitol and Code before contracting for services with both Capitol and Code. By its own admission, Creative sought Code's services as "a backup" and "to serve as a safety net in the event Capitol failed to perform," which is precisely what happened. (Pl. Mem. Opp. Capitol Mot. Summ. J. at 6; Pinkerton 5/18/05 Dep. at 302-03.) Creative tries to preserve its argument by claiming that Capitol was the "primary hauler" of disposal material, and that Code was only a secondary provider of services. Creative asserts that it did not pursue other primary haulers based on Capitol's promise. This distinction, however, is purely nominal. Creative did pursue other disposal companies, namely Code. Whether Code was contracted for as a primary or secondary hauler is irrelevant. Creative did not refrain from soliciting other companies, and therefore cannot now assert that it relied on Capitol's promise to its detriment.

---

22, 2004).

### B.  Breach of Contract

#### 1.  Impossibility of Performance

Capitol asserts that its quote to Creative was based specifically on disposal occurring at Transmine's New York facility, and that it was never informed that the permit required that disposal take place in either Pennsylvania or New Jersey.  Therefore, when NYDEC refused to allow disposal at the Transmine facility, performance under Capitol's agreement with Creative became impossible because it would have been illegal to dispose of the material without a NYDEC permit.

Capitol's argument with respect to impossibility rests on the assumption that disposal at the Transmine facility was one of the terms of its agreement with Creative.  However, Capitol does not direct this Court to any explicit language establishing that condition, nor could this Court locate any. Under the terms of the contract, performance was not impossible.  Capitol could have still performed by disposing of the material at another facility.  Capitol states that "Creative was well aware Capitol's competitive quote was for transportation and disposal to Transmine's Westhampton facility at this time, July 2003, and certainly by September 2, 2003 when Creative received *Transmine's* acceptance letter via Capitol."  (Capitol Mem. Supp. Mot. Summ. J. at 45 (emphasis in original).) Capitol also states that it kept Creative apprised of Transmine's attempt to obtain approval from NYDEC.  However, this does not necessarily indicate that the parties were in agreement that Capitol's quote was specific to disposal at the Transmine facility.  Whether Capitol's quote was specific to the Transmine facility and that this was "clearly understood" between the parties, as Capitol asserts, is an issue of fact that cannot properly be determined on a motion for summary judgment.

## 2. <u>Negotiating in Good Faith</u>

"'In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance.'" *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 462, 807 N.E.2d 869, 875, 775 N.Y.S.2d 757, 764 (2004) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 746 N.Y.S.2d 131 (2002)). The Second Circuit "has expressly held that, under New York law, a duty to disclose material facts is triggered[] . . . 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *Grumman Allied Indus., Inc., v. Rohr Indus., Inc.*, 748 F.2d 729, 738-39 (2d Cir. 1984) (quoting *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)).

Capitol asserts that Creative did not negotiate with Capitol in good faith because Creative failed to disclose to Capitol that, according to the permit, the dredge from the Marina must be disposed of at a facility in New Jersey and/or Pennsylvania. This fact is highly contested between the parties. Capitol asserts that it was never informed, at any time, by Creative that the dredged sediment had to be disposed in either New Jersey or Pennsylvania. (Capitol Rule 56.1 Stmt. ¶¶ 18, 19.) Creative asserts that it provided Capitol with this information and that Capitol was aware of the disposal site location requirements yet thought it could obtain approval at a site it was using in an unrelated project. (Pl. 3/1/06 Rule 56.1 Stmt. ¶¶ 18, 19, 24, 25; Pinkerton 5/18/05 Dep. at 39-40, 45-47; Pinkerton 5/19/05 Dep. at 145-47; Pinkerton 9/6/05 Dep. at 31, 47-48; Albanese Dep. at 31-33.) Clearly, whether or not Creative disclosed this information to Creative is an issue of fact precluding summary judgment.

3.    **Unilateral Mistake**

Capitol claims that the contract between Capitol and Creative is voidable because of Capitol's unilateral mistaken belief as to the permissible disposal locations as well as Capitol's and Creative's mistaken belief as to the chemical content of the dredged material.  In furtherance of this argument, Capitol asserts that "[w]ith respect to the defense of mistake, the courts of this State have long recognized that one who makes a bid based on an honest and unintentional mistake, can in the interests of equity, be relieved from his contractual obligation."  (Capitol Mem. Supp. Mot. Summ. J. at 50 (citing *New York v. Atl. Audio-Visual Corp.*, 118 A.D.2d 998, 1000, 499 N.Y.S.2d 995 (3d Dep't 1986)).)  However, the cases on which Capitol relies involved facts distinct from those in the present case.  Those cases address errors in either transcribing or calculating the initial bid, which were withdrawn in unequivocal language once the errors were discovered.  The disputes in those cases occurred where the party who accepted the bid attempted to hold the bidder to the original bidding price.  Here, a contract was formed between the parties for an agreed price.  Capitol is claiming that it could not perform under the contract based on information that was unknown to it at the time the bid was made.

Under New York law, in order for a court to allow rescission of a contract on the basis of unilateral mistake, "a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made."  *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 795 (S.D.N.Y. 1993).  If the party establishes a unilateral mistake as to a basic assumption of the contract, a court may "void releases even in the absence of fraud."  *Middle East Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987); *see also The Indep. Order of Foresters v. Donald, Lufkin & Jenrette,*

22

*Inc.*, 157 F.3d 933, 939 (2d Cir. 1998) ("[A]s a basic proposition, a contract is made voidable by either unilateral or mutual mistake only where the asserted mistake concerns a 'basic assumption on which the contract was made.'") (citing RESTATEMENT (SECOND) OF CONTRACTS, §§ 152-53); *Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 330-31 (S.D.N.Y. 2002) (Conner, J.).

Capitol may claim that it entered into the contract with Creative under mistaken beliefs with respect to the chemical contents of the dredged material and the location of permissible disposal locations; however, we cannot conclude as a matter of law that Capitol was in fact mistaken. With respect to permissible disposal locations, Creative asserts, with supporting testimony of Pinkerton, that Capitol was informed of this requirement, and that Capitol, aware of this requirement, thought that it could secure a permit through NYDEC for a New York disposal facility. (Pinkerton 5/18/05 Dep. at 39-40, 45-47, 147; Pinkerton 9/6/05 Dep. at 31, 48.)

> Q: What site are you talking about? Which site are you talking about, I'm sorry?
> A: . . . the contract documents say Pennsylvania, New Jersey. Dan Albanese at Capitol proposed a site in New York. I discussed that with him immediately.
> Q: With him?
> A: With Dan Albanese. And he said he had, that that site was not probably available or known to DEC when they were putting this thing together. He couldn't understand why now it wouldn't be an acceptable site, so he provided all the paperwork. I forwarded that to John Clemente. I elaborated to John that it was a New York site and he didn't have any problem. He said, Let's put it forward.

(Pinkerton 9/6/05 Dep. at 31.) Drawing all inferences in favor of Creative, it appears Capitol was aware of the disposal site requirements, and therefore not operating under a mistake. Capitol also asserts that both it and Creative were operating under a mistaken belief with respect to the chemical

contents in the Marina due to New Rochelle's alleged failure to disclose the full 1996 test results and the 2000 test results. Regardless, Capitol admits it directed Creative to conduct current chemical analysis, which was done in July 2003, with the results being given to Capitol. This fact seems to negate any mistake regarding chemical content. However, Capitol does not assert that Creative knew or should have known that Capitol was operating under the mistaken belief as to the actual test results. Therefore, Capitol cannot be granted summary judgment on the issue of unilateral mistake.

### 4.  <u>No Contract Formed</u>

Capitol claims that no contract was ever formed between the parties because the work order, relied on by Creative, states that the subcontractor's commencement of work shall signify acceptance, which never occurred. Capitol also asserts that the work order was never fully executed, stating "[g]enerally, where the parties contemplate that a signed writing is required there is no contract until one is delivered." (Capitol Reply Mem. Supp. Mot. Summ. J. at 10 (citing *In the Matter of Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148, 390 N.E.2d 1143, 417 N.Y.S.2d 218 (1979)).)

At the outset, it is noted that the work order was provided by Creative and sent to Capitol to authorize it to perform transport and disposal of the dredged material. It is dated September 22, 2003, and states "One copy of this Work Order must be signed and returned before the commencement of work." (Capitol Reply Mem. Supp. Mot. Summ. J., Ex. C.) The order also indicates that the subcontractor's "commencement of work" shall signify acceptance of the terms of the work order. The agreement is signed by Dan Albanese of Capitol.

One of the essential elements of a contract is mutual assent. *See Express Indus. & Terminal*

*Corp. v. N.Y.S. Dep't of Transp.*, 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 693 N.Y.S. 2d 857 (1999).

"The manifestation of expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." *Maffea v. Ippolito*, 247 A.D.2d 366, 367, 668 N.Y.S.2d 653 (2d Dep't 1998). "Summary judgment is proper when the 'words and actions that allegedly formed a contract [are] so clear themselves that reasonable people could not differ over their meaning.'" *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (quoting *Bourque v. F.D.I.C.*, 42 F.3d 704, 708 (1st Cir. 1994)).

While it is unclear what is meant by "commencement of work" the order states that the order must be signed and returned before commencement of work, and indeed Albanese signed it and sent it back to Creative. Even if Capitol did not actually commence disposal, its actions indicate its assent to contract. Reviewing the facts in the light most favorable to Creative, as is required, Capitol's actions in having their Business Manager sign a work order with Creative for the Project, as well as locating and securing a disposal facility indicates assent to the contract. Therefore, Capitol cannot be granted summary judgment on this issue.

### 5.    <u>Damages</u>

Capitol also asserts that "Creative failed to establish, beyond its pleadings, that it suffered any damages with regard to transportation and disposal," and, since it suffered no damages, its claim should fail as a matter of law. However, Creative and Capitol's contract provides "Subcontractor will indemnify . . . Contractor . . . against any and all damages suffered by the Contractor arising out of the Subcontractor's breach of this agreement or which the Contractor is compelled to pay any third parties." (Capitol Reply Mem. Supp. Mot. Summ. J., Ex. C ¶ 19.) Whether the failure of Capitol

to provide transport and disposal led to damages is an open question not appropriately determined at this stage.

### III. <u>Code's Motions</u>

#### A. <u>Motion on Creative's Claim</u>

##### 1. <u>Promissory Estoppel</u>

As with its claim against Capitol based on promissory estoppel, Creative has conceded that it cannot maintain a claim for promissory estoppel against Code on the allegation that "Creative made binding contract commitments to the City of New Rochelle in justifiable reliance on the oral and written statements that . . . Code would be able to handle the transportation and disposal of the entirety (up to 15,000 tons) of dewatered dredge material from the New Rochelle Project." (2d Am. Complt. ¶ 35; Pl. Mem. Opp. Code Mot. Summ. J. at 8.)

However, Creative asserts, as it did in relation to its claim against Capitol, that it can maintain an action for promissory estoppel based on its allegation that "[i]n justifiable reliance on the oral and written statements that . . . Code would be able to handle the transportation and disposal . . . of dewatered dredge material from the New Rochelle Project, Creative refrained, to its detriment, from soliciting proposals from other firms regarding transportation and disposal . . . of dewatered dredge material from the New Rochelle Project." (Pl. Mem. Opp. Code Mot. Summ. J. at 8; 2d Am. Complt. ¶ 36.) Creative specifies that "[t]hroughout the month of November 2002, Code repeatedly assured Creative that permits for an alternative site would soon be obtained . . . . Based on these assurances, Creative refrained from subcontracting with another disposal company for that entire month." (Pl. Mem. Opp. Code Mot. Summ. J. at 8.)

It is clear from a reading of the Second Amended Complaint that the claim is not so limited, and Creative's attempt to so limit it now is merely an effort to maintain its action for promissory estoppel against Code. The standard required for a promissory estoppel claim has already been addressed, *infra* Part II.A. As discussed, Creative did not refrain from seeking other disposal companies. It already had a contract with Capitol, and Code was attempting to locate another disposal facility on Creative's behalf. (Pinkerton 5/18/05 Dep. at 255-57.) In addition, Creative received a proposal from Clean Earth on November 10, 2003, which indicates that Creative was discussing the option of working with Clean Earth prior to the beginning of December. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 53.). Therefore, Creative's claim for promissory estoppel against Code is dismissed.

### 2. <u>Breach of Contract</u>

Code asserts that its contract with Creative was conditioned on the disposal facility's acceptance of the dredged material, *i.e.*, that the material's chemical composition met the facility's requirements. According to Code, when that condition was not met, it had no contractual obligation to Creative. Therefore, it did not breach any contract with Creative.

"Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'" *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting *Jones v. Cunard S.S. Co.*, 238 A.D. 172, 173, 263 N.Y.S. 769 (2d Dep't 1933)). It must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid. *Id.*; *see Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995). The papers to be incorporated by reference into the document "must be so

referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." *Chiacchia v. Nat'l Westminster Bank USA*, 124 A.D.2d 626, 628, 507 N.Y.S.2d 888 (2d Dep't 1986).

Code's Sept. 3, 2003 proposal outlines the "Planning Assumptions" for the proposal. (Code Reply Mem. Supp. Mot. Summ. J., Ex. D.) Included was the assumption that "Waste approval will be based on facility acceptance." (*Id.*) This document is specifically identified as "Code Proposal # C0309537, Sediment Disposal New Rochelle, NY" and proposes two options: a Pennsylvania facility and a New Jersey facility. (*Id.*) The work order, dated October 9, 2003 and signed by representatives of Creative and Code on October 27, 2003, lists the description of work: "Provide transportation and disposal of dewatered dredge material for the New Rochelle Municipal Marina Dredging Project per Code Proposal #C0309537- PA Facility Option." (*Id.*, Ex. E.) Creative claims that this proposal cannot be incorporated because the contract was formed two months after the proposal and the integration clause of the contract precludes written proposals prior to execution of the contract from becoming part of the contract. (Pl. Mem. Opp. Code Mot. Summ. J. at 6.) However, the language of the contract is clear and unambiguous. *See Kay-R Elec. Corp. v. Stone & Webster Constr. Co., Inc.*, 23 F.3d 55, 58 (2d Cir. 1994) (quoting *Thailer v. LaRocca*, 174 A.D.2d 731, 733, 571 N.Y.S.2d 569, 571 (2d Dep't 1991) ("The law of New York states that 'where . . . the language with respect to the parties' intent is clear and unambiguous, it will be given effect, regardless of one party's claim that he intended something else.'")). The work description specifically references that the project will be performed "per Code Proposal #C0309537," thereby incorporating the prior proposal specifically identified. Code also asserts that terms outlined in the Sept. 4, 2003 Alliance letter were also incorporated into the agreement. (Code Mem. Supp. Mot.

Summ. J. at 8.)  This letter states that Alliance's Coplay facility can accept 20,000 to 25,000 tons of "marina mud."  (*Id.*)

> This acceptance is based on the material complying with the representative analytical, which has met the acceptance criteria for the facility and the material not containing any strong odors and passing a paint filter test.  Any material received that does not meet the acceptance criteria and specifications will be rejected/reloaded and returned to the site of origin.

(*Id.*)  Although Creative disputes that the letter was incorporated into the agreement, and there is nothing in the work order expressly indicating incorporation of this letter, it is clear that this condition was known.

It is now obvious that the parties had different understandings as to what material would be accepted by the disposal site.  AS&M's facility had a "general permit" from the PADEP that permitted it to accept only "clean fill."  (Ducceschi Dep. at 63, 68.)  Under the PADEP guidelines, dredge material, such as the material from the Marina, is considered "residual waste" and therefore could not be accepted by AS&M.[18]  These specifications were not indicated in the Sept. 4, 2003

---

[18] Dredge material was apparently always considered "residual waste" by the PADEP. (Ducceschi Dep. at 68.)  There was a change in the PADEP's regional regulations in April 2004. (*Id.*)  It is unclear from PADEP representative Reno P. Ducceschi's deposition whether this change had effected the classification of dredge material.

> Q:      -- dredge material was always considered residual waste?
> A:      Yes, it -- yes, it was.
> Q:      And in the capc -- in the category of residual waste, it could not be used as clean fill material?
> A:      That's correct.
> Q:      In April of '04 the policy was changed so that dredge material was now being classified as what?
> A:      Well, the regulation still call -- if you look at the residual waste regulation, they'll still have residual waste under -- I mean dredge under residual waste. But yet, when the management of clean fill policy came in there and was effective, it included dredge as clean fill.

(*Id.*)

Alliance letter that was sent to Creative. However, on that same date Alliance sent *another* letter to Code which specifically indicates:

> All fill material is acceptable at the facilities based on the material meeting the acceptance criteria set forth by *the* PADEP Clean Fill-Safe Fill regulations of 6/21/03 (see attached Tables). All material *must* meet the definition of Clean-fill; however the use of the Safe-fill limits is permissible. The material must not contain any trash/garbage. The material must not contain any strong odors and pass a paint filter test.

(Pl. Mem. Opp. Code Mot. Summ. J., Ex. G (Ducceschi Dep. at Ex. S)(emphasis added).) It is unclear whether Creative ever received *this* letter, which unambiguously states what the Alliance facility can accept. (Pinkerton 5/18/05 Dep. at 119-20.) Although facility acceptance was a condition of the agreement between Code and Creative, it is clear that the parties had a different understanding of what would meet the requirements of "facility acceptance." It remains unclear whether this warrants rescission based on mistake. Further factual development at trial is necessary to determine this issue.

### B.   Motion on Code's Counterclaim

Finally, Code seeks payment for the work performed under the contract when the AS&M facility was accepting the material. Apparently, Creative withheld these funds because it believed that it was entitled to damages from Code in excess of the money it owed to Code for transportation and delivery of the 26 loads of material to AS&M. Code asserts that if "Code was not in breach of contract with Creative and that Creative's claim of promissory estoppel is not accurate, then clearly, Creative would have no justification for its non-payment to Code." (Code Mem. Supp. Mot. Summ. J. at 14.) As this Court has not dismissed Creative's breach of contract claim, it is still to be

determined by the trier of fact whether Code is entitled to be paid for the work already performed.

## IV.  New Rochelle's Motion Against Creative

### A.  Notice of Claim

The City asserts that Creative failed to comply with the notice of claim requirements in: (1) its contract with the City[19]; and (2) the City Charter.  Specifically, New Rochelle directs the Court to two sections of the New Rochelle City Charter, sections 127(a) and 127(b), which contain notice of claim requirements.  Under § 127(a), "No action or proceeding to recover or enforce *any claim*, debt or demand against the City shall be brought until the expiration of 30 days after the same has been presented to the Director of Finance for Audit."  (New Rochelle Mem. Supp. Mot. Summ.  J., Ex. 79 (emphasis added).)  Under § 127(b), actions based in tort must comply with section 50-e and 50-i of the General Municipal Law.  (*Id.*)  Section 50-e of the New York General Municipal Law requires that a notice of claim be filed within ninety days of the incident giving rise to the claim. Under § 50-i of the New York General Municipal Law, unless the plaintiff has complied with the notice of claim requirement, the action cannot commence.

### 1.  Notice Requirement Under the Contract

The City asserts that Creative failed to comply with this notice requirement because it failed to timely notify the City of the complications regarding the bubbler system and the impact the 2000 test results would have on the Project.  According to the City, Creative was contractually obligated

---

[19] The contract between Creative and the City contains the notice provision set forth in section I.C., *supra*.

to "promptly notify the City of any changed conditions or other problems in the progress of the work that may result in damages." (New Rochelle Rule 56.1 Stmt. ¶ 91.) However, Creative interprets the contract to read that it was only required to notify the City "once damages actually were sustained." (Pl. Mem. Opp. New Rochelle Mot. Summ. J. at 13.) "Contorted semanticism must not be permitted to create an issue where none exists. Yet, where the text of an agreement reasonably allows for varying interpretations—whether by the inadvertence or design of the draftsman—the need for judicial construction cannot, and may not, be avoided." *Wards Co., Inc. v. Stamford Ridgeway Assoc.*, 761 F.2d 117, 120 (2d Cir. 1985) (citing *Grand Union Co. v. Cord Meyer Dev. Corp.*, 735 F.2d 714, 717 (2d Cir. 1984)).

The language in the clause is in accord with Creative's interpretation. Viewing the evidence in the light most favorable to Creative, as is required, it learned of the bubbler system when it began dredging on October 16, 2003, but it was not apparent that the bubbler system would substantially interfere with the Project and cause delay until January 2004. A letter was sent to the City by Creative on January 5, 2004 informing the City of the problem with the bubbler system. Creative's subsequent letter, dated January 21, 2004, outlined its damages. Therefore, Creative complied with the notice requirements under the contract.[20]

---

[20] The contract between the City and Creative also has another relevant provision with respect to "extra work":

> "Extra Work" and "Additional Work" shall be performed in accordance with applicable provisions of the Contract specifications, or, if no applicable specifications are contained in the Contract, under such specifications as may be specifically established by the Engineer.

> The Engineer shall notify the Contractor of the necessity for such Extra Work, stipulating its character and the extent and the proposed method of payment. Upon receipt of such notification, the Contractor shall advise the Engineer in writing of

## 2.    Statutory Notice Requirements

"A plaintiff must abide by the statutory requirements for notification to the appropriate public body or official." *PBS Bldg. Sys., Inc. v. City of New York*, No. 94 Civ. 3488, 1996 WL 583380, at *3 (S.D.N.Y. Oct. 10, 1996) (citing *Parochial Bus Sys., Inc. v. Bd. of Educ. of the City of N.Y.*, 60 N.Y.2d 539, 547-49, 458 N.E.2d 1241, 1245-46, 470 N.Y.S.2d 564, 568-69 (1983). The purpose of these requirements is to place the municipality on notice so that it may investigate the claim and "determine whether the claims should be adjusted or satisfied before the parties are subjected to the expense of litigation." *Davidson v. Bronx Mun. Hosp.*, 64 N.Y.2d 59, 62, 473 N.E.2d 761,763, 484 N.Y.S.2d 533, 535 (1984). A plaintiff cannot avoid the notice of claim requirements by merely asserting that the defendants have suffered no prejudice. *See PBS Bldg. Sys.*, 1996 WL 583380, at *3. *But see Brooklyn Sch. for Special Children v. Crew*, No. 96 Civ. 5014, 1997 WL 539775, at *16 (S.D.N.Y. Aug. 28, 1997) (stating "courts have excused plaintiffs from the formal notice of claim requirement where defendants have received clear notice 'of the nature of the claims, and time when, the place where and the manner in which the claims arose'" (quoting *Deposit Cent. Sch. Dist. v. Pub. Employment Relations Bureau*, 214 A.D.2d 288, 291-92, 633 N.Y.S.2d 607 (3d Dep't 1995))).[21]

--------------------------------

the compensation, either unit price of lump sum as requested, for which he proposes to perform the Extra Work required. The Engineer may accept the compensation proposed by the Contractor, or, if he considers the prices excessive, he may order the work done on a "Cost Plus" basis . . . .

(New Rochelle Mem. Supp. Mot. Summ. J., Ex. 14, Section C, at C-22 to 23.) Again, viewing the evidence in the light most favorable to Creative, the problem with the bubbler system may not have constituted "extra work" until it interfered with the dredging generally. At which point, in January 2004, Creative provided the City with written notice of the desire to seek extra compensation.

[21] *Brooklyn School for Special Children v. Crew*, and the cases cited for this proposition therein, address notice of claim requirements under N.Y. EDUC. L. § 3813. In addition, the monetary damages sought in *Brooklyn School* were incidental; the primary relief sought was equitable relief

"The appropriate remedy for failure by the plaintiff to comply with statutory notice of claim requirement is dismissal of the action, even if the claim is meritorious." *PBS Bldg. Sys.*, 1996 WL 583380, at *3 (collecting cases).

Clearly, Creative was required to follow the notice requirement as outlined in the City Charter and notify the Director of Finance for Audit of its potential claim. However, Creative sent a letter, dated May 20, 2004, to the City's Corporation Counsel purporting to put the City on notice of its claim in compliance with New York Court of Claims Act § 10. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 69.) This case is factually distinct from cases that found such notice insufficient. Those cases generally dealt with a large municipality, such as New York City, where sending notice to an inappropriate office would be insufficient to provide adequate notice to the proper city official. Here, Creative had continuous discussions with the City concerning its contractual obligation to that entity. Creative sent the letter to the City's Corporation Counsel, as opposed to a general municipal agency, to put the City on notice. In this instance, this was sufficient to make the City's Director of Finance aware of a potential claim.

Creative has sought to amend its Complaint to allege compliance with General Muncipal Law § 50-e.[22] Creative would be required to comply with New Rochelle City Charter § 127(b), and thus § 50-e, if it were bringing an action in tort. However, "[a]lthough fraud and misrepresentation are traditionally considered torts, New York courts have held that a notice of claim under § 50-e is not

---

in the form of an injunction. 1997 WL 539775, at *16.

[22] New York General Municipal Law 50-e(1)(a) provides, "In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action . . . the notice of claim shall comply with and be served in accordance with the provisions of this section."

necessary when alleging fraud and breach of contract against a municipal corporation." *Guinyard v. City of New York*, 800 F. Supp. 1083, 1090 (E.D.N.Y. 1992) (permitting discrimination claims despite plaintiff's initial characterization of these claims as tort claims). Moreover, New York General Municipal Law 50-i is inapplicable. That statute provides:

> No action . . . shall be prosecuted or maintained against a city . . . for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such city . . . unless . . . a notice of claim shall have been made and served upon the city.

N.Y. Gen. Mun. L. § 50-i. Creative has not brought a claim for personal injury, wrongful death or damage to real or personal property, therefore this provision is also inapplicable. In light of this determination, Creative's motion to amend its Complaint to allege compliance with New York General Municipal Law 50-e is denied as moot.

### B.    Rescission

Under New York law, "[t]here is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case." *Callanan v. Powers*, 199 N.Y. 268, 92 N.E. 747, 752 (1910). Rescission is permitted where there is fraud or duress in the inducement of the contract, failure of consideration, inability to perform, or a breach of the contract so substantial that it defeats the object of the parties in making the contract. *See Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 475 N.Y.S.2d 869, 874 (2d Dep't 1984) (citing *Callanan*, 92 N.E. at 752); *Baratta v. Kozlowski*, 94 A.D.2d 454, 464 N.Y.S.2d 803, 806 (2d Dep't 1983).

Creative seeks rescission of the contract based on its claims of fraudulent inducement, mutual mistake, unilateral mistake and fraud. (2d Am. Complt. ¶¶ 67, 79, 82.) These claims are based

primarily on Creative's assertion that the City concealed and/or withheld the existence of the bubbler system in the Marina and the 2000 test results. As an initial matter, the City claims that Creative has waived its right to claim rescission.

### 1. Unilateral Mistake and Fraudulent Inducement

The elements of unilateral mistake have already been discussed above and need not be repeated here. "New York law does not permit reformation or rescission of a contract for unilateral mistake alone. A unilateral mistake must be 'coupled with some fraud.'" *Travelers Indem. Co. of Ill. V. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 498 (S.D.N.Y. 2004) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (internal citations omitted)). To recover under a theory of fraudulent inducement, the plaintiff must prove: (1) misrepresentation of a material fact; (2) falsity of the representation; (3) scienter; (4) reasonable reliance; and (5) damages. *May Dep't Stores Co. v. Int'l Leasing Corp., Inc.*, 1 F.3d 138, 141 (2d Cir. 1993); *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980). The Federal Rules of Civil Procedure require the plaintiff to state "with particularity" the circumstances that give rise to the fraud. *See* FED. R. CIV. P. 9(b). Pleadings under Rule 9(b) "cannot be based upon information and belief." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Although information and belief are sufficient where "the facts underlying the fraud are peculiarly within the opposing party's knowledge," plaintiff still bears the burden of pleading the basis for its belief. *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 Civ. 3748, 2006 WL 278138, at *6 (S.D.N.Y. Feb. 2, 2006).

Creative alleges that the City failed to disclose the complete 2000 test results and the bubbler system in the Marina. The City, in turn, claims that under the terms of the contract, this information

was readily available to Creative and that Creative has failed to sufficiently plead that the City withheld the information to induce reliance.

"'[W]hen dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose arises only when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Travelers Indem.*, 322 F. Supp. 2d at 499 (quoting *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002)). Where parties are involved in an arms length commercial transaction, there is no fiduciary duty to disclose information absent specific circumstances, such as the application of the "special facts doctrine." *Id.*; *see In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002). Under this doctrine, the courts impose a duty on a party with "superior knowledge of essential facts" to disclose those facts where nondisclosure would make the transaction inherently unfair. *Travelers Indem.*, 322 F. Supp. 2d at 499. For this doctrine to be applicable, "[t]he plaintiff must prove that '(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge.'" *Id.* (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995)).

Here, it is unclear whether the City had superior knowledge or knew Creative was operating under mistaken knowledge. The City claims that the contract terms permits Creative to discover this information. Under the terms of the contract, Creative was permitted to obtain its own samples of Marina sediment for testing. (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 14, Section G, at TS-3.) Throughout the contract, the City not only permits, but requires, Contractors to examine the plans and location of the Project. The contract states that "[c]ontractors are particularly requested

to examine the plans and specifications and location of the work before bidding." (*Id.*, Section A, I(b), at A-1.)  However, that does not necessarily mean that the information regarding the extent of the bubbler system was readily available.

Creative became aware of the existence of the bubbler system only after it began dredging on October 16, 2003 (New Rochelle Rule 56.1 Stmt. ¶ 165; Pl. 3/10/06 Rule 56.1 Stmt. ¶ 165.) After discovering the bubbler system, Creative continued with the dredging project but began to experience problems later.[23]  (New Rochelle Rule 56.1 Stmt. ¶ 172; Pl. 3/10/06 Rule 56.1 Stmt. ¶ 172.) .  The bubbler system had been in place since the late 1960's, however there has been no evidence submitted to indicate that its existence and the extent of its components were readily available.  The City asserts that parts of it were visible around the Marina.  Creative asserts that the parts that caused difficulty in the dredging were located underwater and were not visible.  It is unclear whether a reasonable contractor would have been placed on notice of this condition prior to starting the dredging.  These are issues that must be established at trial and are inappropriate to determine at this stage of the litigation.

---

[23] In support of its position the City argues that Creative did not inform the City of the difficulty that the bubbler system was causing until January 5, 2004 in a letter to the City.  In this letter, Creative did not claim that it was fraudulently induced into the contract because it had not been told about the bubbler system.  Creative indicated that although "[t]he existing bubbler system should have been identified in the bid specifications," it wanted to continue to perform under the contract and treat the bubbler system as "a changed condition" under the contract.  (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 64.)  In fact, Creative continued to seek payment under the terms of the contract through March 15, 2004, even after learning about the bubbler system.  However, it is unclear whether Creative was aware of the extent of the bubbler system as soon as it started dredging or whether it should have become so informed.  Whether it was reasonable for Creative to attempt to continue with the Project after discovery of the bubbler system is a question of fact for a jury.

## 2.    **Mutual Mistake**

"A 'mutual mistake' occurs when 'both . . . parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent.'" *Healy v. Rich Prod. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (quoting 21 N.Y. Jur. 2d Contracts § 121 (1982)). "[A]s a basic proposition, a contract is made voidable by . . . mutual mistake only where the asserted mistake concerns a 'basic assumption on which the contract was made.'" *Indep. Order of Foresters*, 157 F.3d at 939 (2d Cir. 1998) (citing RESTATEMENT (SECOND) OF CONTRACTS, §§ 152-53).

Creative asserts that a mutual mistake occurred here because New Rochelle claims that it was not aware of the existence of the bubbler system at the time it entered into the contract with Creative, and, to that extent, they were both mistaken regarding the true condition of the Marina at the time the contract was entered. However, the City does not assert that it was not aware of the existence of the bubbler system at the time the contract was entered. Rather, it asserts that "at the time Creative was bidding on the Dredging Project, no person employed by the City could remember a time when the Bubbler System was operational, or was otherwise aware of the components of the Bubbler System." (New Rochelle Rule 56.1 Stmt. ¶ 162.) To the extent that the City was not aware of the components of the bubbler system remaining in the Marina, this mistake does not go to a basic assumption of the contract. The contract was for the dredging of the Marina. The existence of the bubbler system makes the completion of the contract more difficult, but does not defeat the object of the contract. Moreover, such a difficulty was specifically anticipated in the parties' agreement in the "Extra Work and Additional Work" section of the contract. This provision provides for compensation for work that is "an essential part of the job but which was not anticipated at the time when the plans and specifications were prepared." (New Rochelle Mem. Supp. Mot. Summ. J., Ex.

14.)  Therefore, summary judgment is granted dismissing the claim to void the contract on the basis of mutual mistake.

### C.      Negligent Misrepresentation and Omission

A plaintiff must satisfy the following elements to recover for negligent misrepresentation under New York law:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted). Ordinarily, "[t]o prevail on a negligent misrepresentation claim, plaintiff must demonstrate that the defendant owed it a duty, due to a special relationship between the parties, to provide correct information and that it was foreseeable that plaintiff would reasonably rely on this information." *Seneca Ins. Co., Inc. v. Wilcock*, No. 01 Civ. 7620, 2005 WL 2898460, at *6 (S.D.N.Y. Nov. 3, 2005) (citation omitted).  In negligent misrepresentation claims based on omissions,

> New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citations and internal quotations

omitted). Here, only the third situation is applicable, and, as discussed, *infra* Part IV.B.1., this is an issue of fact for a jury. Therefore, summary judgment on the claim for negligent misrepresentation by the City is denied.

### D.    Breach of Implied Covenant of Good Faith

Under New York law, every contract contains an implied covenant of good faith and fair dealing. "[T]he duty of good faith and fairing dealing may be implied in a contract 'in aid and furtherance of other terms of the agreement of the parties.'" *Anthracite Capital, Inc. v. MP-555 W. Fifth Mezzanine, LLC*, No. 03 Civ. 5219, 2005 WL 1155418, at *9 (S.D.N.Y. May 17, 2005) (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304, 448 N.E. 86, 91, 461 N.Y.S.2d 232 (1983). "This covenant includes 'an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.'" *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir. 1991) (quoting *Grad v. Roberts*, 14 N.Y.2d 70, 75, 198 N.E.2d 26, 248 N.Y.S.2d 633 (1964)); *see also Kader v. Paper Software, Inc.*, 111 F.3d 337, 342 (2d Cir. 1997); *Tagare v. NYNEX Network Sys. Co.*, 921 F. Supp. 1146, 1150 (S.D.N.Y. 1996) (Conner, J.); *Wieder v. Skala*, 80 N.Y.2d 628, 609 N.E.2d 105, 593 N.Y.S.2d 752 (1992). Where the contract contemplates the exercise of discretion, this implied covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995). That said, no obligation can be implied that would be inconsistent with explicit, bargained-for contractual terms. *Mark Patterson, Inc. v. Bowie*, 237 A.D.2d 184, 654 N.Y.S.2d 769, 771 (1st Dep't 1997); *Dalton*, 639 N.Y.S.2d at 979-80.

In refuting the City's claim, Creative asserts that its "breach of implied covenant of good faith claim is based primarily on New Rochelle's conduct after the bubbler system was discovered, not on New Rochelle's failure to disclose its existence at the outset." (Pl. Mem. Opp. New Rochelle Mot. Summ. J. at 34.)[24] The contract explicitly states that should "extra work" arise, *i.e.*, work "which was not anticipated and not capable of being classified under any Contract items," "Creative [is] required to provide advance written notification to the Engineer of its proposed compensation to perform the extra work." (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 14, Section C, IV(d), at C-22 to 23.) Under the contract, all notice must be in writing. (*Id.*, Section C, I(b)(13), at C-1.) The contract leaves to the discretion of the Engineer whether to have the work completed by the contractor or to have to work done on a "Cost Plus" basis. (*Id.*, Section C, IV(d), at C-23.) Therefore, there is an implied covenant that the Engineer will not "act arbitrarily or irrationally in exercising that discretion." *Dalton*, 639 N.Y.S.2d at 980. Creative provided written notification regarding the extra work in its January 5, 2004 letter. Whether the City acted arbitrarily or irrationally under the contract is an issue of fact not proper for summary judgment. Therefore, the City's motion for summary judgment with respect to the breach of implied covenant of good faith is denied.

### E.     Causation

"Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly* and *proximately caused* his or her damages."

---

[24] Regarding the 2000 test results, Creative states "that it makes no direct claim for damages based upon New Rochelle withholding the 2000 Chemical Test Results." (Pl. Mem. Opp. New Rochelle Mot. Summ. J. at 34.)

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original). "Damages for breach of contract must be 'such only as actually follow or may follow from the breach of contract.'" *Id.* (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886)). The City alleges that Creative cannot demonstrate that the City's alleged omissions regarding the complete 2000 test results and the bubbler system proximately caused its claimed damages. Indeed, plaintiff concedes that it "makes no direct claim for damages based upon New Rochelle withholding the chemical test results." (Pl. Mem. Opp. New Rochelle Mot. Summ. J. at 35.) However, Creative does assert that it suffered damages due to New Rochelle's failure to disclose the bubbler system. Whether this is so, is a question of fact to be determined by a jury. Therefore, the City's motion for summary judgment on this issue is denied.

### F. Punitive Damages

The City also seeks dismissal of Creative's claims for punitive damages. Although a municipality may be subjected to suit for tortious activity, "'[t]he general rule today is that no punitive damages are allowed unless expressly authorized by statute.'" *Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259-60 (1981)). Creative does not proffer any statute nor even respond to the City's argument with respect to punitive damages. Therefore, Creative's claims for punitive damages are dismissed.

### V. New Rochelle's Remaining Motions

## A.      Partial Motion New Rochelle's Counterclaim Against Creative

New Rochelle has a counterclaim against Creative for breach of contract and damages.  The City asserts that the terms of its contract with Creative are clear and that Creative breached that contract, entitling the City to summary judgment on the issue of liability.  "To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share*, 392 F.3d at 525.  A contract was formed between the City and Creative for the dredging of the Marina.  Although Creative did not timely complete the Project, it is an open question whether this constitutes an actionable breach.  Therefore, the City's motion for partial summary judgment is denied.


## B.      Motion on Capitol's Cross-Claim

The City has moved for summary judgment on Capitol's claim for contribution and indemnification.  As there are still claims remaining against both Capitol and the City, contribution and indemnification cannot be determined until the liability of each is determined.  Since liability turns on questions of fact, this claim cannot be determined at this stage  Therefore, the City's motion for summary judgment on Capitol's claims against it is denied.


## C.      Partial Motion Against the Surety

The City asserts that it is entitled to summary judgment as to the Surety because, under the terms of the Surety Bond, the Surety agreed to pay two million dollars in the event that Creative did not perform.  Under the terms of the Surety Bond, the Surety was to hold the two million dollar bond and pay the City should Creative fail to perform the work mentioned in a "sufficient and

workmanlike manner." (New Rochelle Mem. Supp. Mot. Summ. J., Ex. 36.) As already discussed at length, it is unclear who who responsible for the breach of the contract. Therefore, it cannot be determined whether Creative failed in fact to perform the contract in a "sufficient and workmanlike manner." Therefore, the City's motion for summary judgment against the surety is denied.[25]

## CONCLUSION

For all of the foregoing reasons, the motion of Capitol Environmental Services, Inc. ("Capitol") for summary judgment on the breach of contract claim is denied and is granted as to the promissory estoppel claim, which is dismissed with prejudice. The motion of Code Environmental Services, Inc. ("Code") for summary judgment is denied on the breach of contract claim and granted as to the promissory estoppel claim which is dismissed with prejudice. The motion of Code for summary judgment on its counterclaim against Creative is denied. The motion of the City of New Rochelle, New York ("New Rochelle") for summary judgment on the claims of fraudulent inducement, unilateral mistake, fraud, implied covenant of good faith and negligent misrepresentation is denied and its motion as to the claims for mutual mistake and punitive damages is granted and those claims are dismissed with prejudice. The motion of New Rochelle for summary judgment on its counterclaim for breach of contract against Creative Waste Management, Inc. ("Creative") is denied. New Rochelle's motion for summary judgment against Fidelity and Guaranty Insurance Company and United States Fidelity and Guaranty Company for breach of contract is denied. New Rochelle's motion for summary judgment on Capitol's cross-claim for contribution

---

[25] The Surety filed a "me-too" motion in opposition incorporating by reference the arguments made by Creative.

and indemnification is denied.  Creative's motion to amend its Complaint is denied.


SO ORDERED.

Dated:  White Plains, New York
       April 21, 2006


William C. Conner

Sr. United States District Judge