```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
CREATIVE WASTE MANAGEMENT, INC.,        :

                 Plaintiff,             :
                                                    04 Civ. 9581 (WCC)
       - against -                      :

CAPITOL ENVIRONMENTAL SERVICES, INC.,   :
CODE ENVIRONMENTAL SERVICES, INC. and
CITY OF NEW ROCHELLE, NEW YORK,         :

                 Defendants.            :
- - - - - - - - - - - - - - - - - - - - X          **OPINION**
CITY OF NEW ROCHELLE,                   :          **AND ORDER**

                 Plaintiff,             :

       - against -                      :

FIDELITY AND GUARANTY INSURANCE COMPANY :
and UNITED STATES FIDELITY AND GUARANTY
COMPANY,                                :

                 Defendants.            :
- - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

                                         DOLCHIN, SLOTKIN & TODD, P.C.
                                         **Attorneys for Plaintiff**
                                           **Creative Waste Management, Inc.**
                                         One Commerce Square
                                         2005 Market Street, 24th Floor
                                         Philadelphia, Pennsylvania 19103

JOEL W. TODD, ESQ.

       Of Counsel

                                         LAW OFFICES OF JOEL B. ALBERT, P.C.
                                         **Attorneys for Defendant Capitol**
                                         **Environmental Services, Inc.**
                                         Two Bala Plaza, Suite 300
                                         Bala Cynwyd, Pennsylvania 19004

JOEL B. ALBERT, ESQ.

       Of Counsel

                                         **Copies Mailed to Counsel of Record_____**

**A P P E A R A N C E S :   (continued)**

        WILSON, ELSER, MOSKOWITZ, EDELMAN
          & DICKER, LLP
        **Attorneys for Defendant**
          **Code Environmental Services, Inc.**
        The Curtis Center
        Suite 1130E
        Philadelphia, PA 19106

JONATHAN DRYER, ESQ.

    Of Counsel

        WILSON, ELSER, MOSKOWITZ, EDELMAN
          & DICKER, LLP
        **Attorneys for Defendant**
          **City of New Rochelle**
        Three Gannett Drive
        White Plains, New York 10604

PETER A. MEISELS, ESQ.
LALIT K. LOOMBA, ESQ.

    Of Counsel

        WOLF & SAMSON PC
        **Attorneys for Defendants Fidelity**
          **and Guaranty Insurance Company**
          **and United States Fidelity and**
          **Guaranty Company**
        The Office at Crystal Lake
        One Boland Drive
        West Orange, New Jersey 07052

ADAM P. FRIEDMAN, ESQ.

    Of Counsel

**CONNER, Senior D.J.:**

This action involves five parties and numerous causes of action, including affirmative claims, counterclaims and cross-claims.[1] Relevant to the present motion, however, are Creative's claim for breach of contract against Code and Code's counterclaim for breach of contract against Creative. Code previously moved this Court for summary judgment seeking dismissal of Creative's breach of contract claim and a judgment in its favor on its breach of contract counterclaim. In an Opinion and Order dated April 21, 2006, this Court denied summary judgment on both claims because a genuine issue of material fact existed as to the parties' understanding of an essential term in the contract entered into by Creative and Code. Code now maintains that additional evidence, which was not submitted and, therefore, not considered by this Court on its first motion, unequivocally resolves the genuine issue of material fact which we previously held precluded summary judgment. Accordingly, Code submits this supplementary motion for summary judgment again seeking the dismissal of Creative's breach of contract claim, as well as a judgment in its favor on its breach of contract

---

[1] Plaintiff Creative Waste Management, Inc. ("Creative") initiated this action against defendants Capitol Environmental Services, Inc. ("Capitol"), Code Environmental Services, Inc. ("Code") and the City of New Rochelle, New York ("New Rochelle" or the "City") (collectively, the "defendants"). Plaintiff's original action included claims against Capitol and Code for breach of contract and promissory estoppel, in addition to claims against New Rochelle for fraudulent inducement, breach of implied covenant of good faith, rescission based on mutual mistake and unilateral mistake, fraud, negligent misrepresentation and punitive damages. However, in an Opinion and Order dated April 21, 2006, this Court dismissed on summary judgment plaintiff's claims against Capitol and Code for promissory estoppel, as well as its claims against New Rochelle for rescission based upon mutual mistake and punitive damages. *See Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 612 (S.D.N.Y. 2006) (Conner, J.). Additionally, Capitol asserts cross-claims against Code and New Rochelle for contribution and indemnification, and Code brings a cross-claim against Capitol for contribution and indemnification. Code also asserts counterclaims against Creative for unjust enrichment and breach of contract, and New Rochelle counterclaims against Creative for breach of contract. Lastly, New Rochelle commenced a related action for breach of contract against Fidelity and Guaranty Insurance Company and United States Fidelity and Guaranty Company (collectively the "Surety"), which has been consolidated before this Court (the "consolidated action").

counterclaim against Creative. For the following reasons, Code's motion for summary judgment is granted.

## BACKGROUND

**I.    Factual Allegations**

The facts of this case are set forth extensively in our previous Opinion, familiarity with which is presumed. *See Creative Waste Mgmt.*, 429 F. Supp. 2d at 588-96. Accordingly, we recite only the facts relevant to our resolution of the present issue.

Creative entered into a municipal marina dredging project with the City, as general contractor on August 28, 2003. (*See* Code Rule 56.1 Stmt. ¶ 1; Pl. Rule 56.1 Stmt. ¶ 1.)[2] Creative agreed to dredge sediment from the floor of Long Island Sound in the area in and around the New Rochelle Municipal Marina ("the Marina"). (*See id.*) After entering into the contract with the City, Creative sought bids for the transportation and disposal of the sediment from several companies, including Code. (*See* Def. Code's Rule 56.1 Stmt. ¶ 3; Pl. Rule 56.1 Stmt. ¶ 3.)

On September 3, 2003, Code submitted a proposal for the job to Creative by letter (the "Proposal"). (*See* Todd Aff., Ex. 1.)[3] Code proposed to "transport, dispose and manage approximately 20,000 tons of stabilized dredge sediments from [Creative's] project" for a price of $36.25 per ton using a Pennsylvania disposal facility. Alternatively, it proposed to use a disposal facility in New Jersey for the higher price of $40.00 per ton. (*See id.*) The letter indicated that the

---

[2] The Rule 56.1 Statements cited herein refer to the statements filed by the parties in connection with the first summary judgment motion filed by Code and opposed by Creative.

[3] The Affidavit of Joel W. Todd, Esq. is hereinafter referred to as "Pl. Aff., Ex. __."

Proposal was based on certain "Planning Assumptions," including the condition that "[w]aste approval will be based on facility acceptance." (*See id.*)

Code, via its broker, the Alliance Companies ("Alliance"), arranged for the transportation of the sediment through Rainbow Transportation ("Rainbow"). (*See* Code Rule 56.1 Stmt. ¶ 6.) Donna Root, Director of Operations at Alliance, informed Code by letter, dated September 4, 2003, that it had located a disposal site at its Coplay Quarry ("Coplay") in Whitehall Township, Pennsylvania (the "first Sept. 4, 2003 letter").[4] (*See* Code Mem. Supp. Summ. J., Ex. E.)[5] The letter stated:

> Based on the analytical supplied by Code Environmental Service, representing your . . . project, we have reviewed the data and find it acceptable for our Coplay Quarry in Whitehall Twp., PA. This review and approval is good for approximately 20,000 to 25,000 tons. This acceptance is based on the material complying with the representative analytical; which has met the acceptance criteria for the facility and the material not containing any strong odors and passing a paint filter test.

(*Id.*)[6]

On the same day, Alliance informed Code by letter that it secured an additional disposal facility in Bethlehem, Pennsylvania operated by American Soil & Mulch, Inc. ("AS&M") (the "second Sept. 4, 2003 letter"). (*See* Pl. Aff., Ex. 4; *see also* Pantaleo Dep. at 121-22.) The letter indicated:

---

[4] The letter referred to facility acceptance of "marina mud." (Def. Code Mem. Supp. Summ. J., Ex. E.) Code maintains that their contract was for disposal of "marina mud." (*See* Brown Dep. at 90-91.) Creative asserts that the contract was for "dewatered dredge material," which is consistent with the contract itself. (*See* Pinkerton 5/18/05 Dep. at 300-01; Pl. Aff., Ex. 2.)

[5] Citations to "Code Mem. Supp. Summ. J." refer to Code's Memorandum in Support of its Motion for Summary Judgment dated January 31, 2006.

[6] The material dredged from the Marina was never disposed at the Coplay facility. (*See* New Rochelle Rule 56.1 Stmt. ¶¶ 118, 119; Pl. Rule 56.1 Stmt. ¶¶ 118, 119.)

3

> All fill material is acceptable at the facilities based on the material meeting the acceptance criteria set forth by the [Pennsylvania Department of Environmental Protection] Clean Fill-Safe regulations of 6/21/03 (see attached tables). All material must meet the definition of Clean-fill; however, the use of the Safe-fill limits is permissible. The material must not contain any trash/garbage. The material must not contain any strong odors and pass a paint filter test.

(*See* Pl. Aff., Ex. 4.)

On October 9, 2003, Creative submitted a work order to Code authorizing Code to transport 2,500 tons of "dewatered dredge material" pursuant to the Proposal. (*See* Pl. Aff., Ex. 2.) The work order provided the terms and conditions of the agreement between Creative and Code and, upon its execution, became the contract between the parties. (*See id.*; *see also* Pl. Rule 56.1 Stmt. ¶ 4.) Specifically, the work order provided that Code "will indemnify, hold harmless and defend [Creative] against any and all damages suffered by [Creative] arising out of [Code's] breach of th[e] agreement or which [Creative] is compelled to pay any third person due to [Code's] willful misconduct or sole negligence." (*See* Pl. Aff., Ex. 2.) It also provided that Code must "comply with all rules, regulations, laws and ordinances of any governmental agency applicable" to its work under the contract. (*See id.*)

Under the section entitled "Description of Work," the work order stated that the project would be performed pursuant to "Code Proposal #C0309537 – PA Option," referring to the Proposal and the option relating to the Pennsylvania facility. As we concluded in our prior Opinion, the Proposal, which contained, *inter alia*, the condition that "[w]aste approval will be based on facility acceptance," was incorporated into the contract. *See Creative Waste Mgmt.*, 429 F. Supp. 2d at 603.

4

Pursuant to the contract, Code commenced performance and delivered to AS&M twenty-six loads of material dredged from the Marina, which AS&M accepted for disposal at a certain fee provided by Code. (*See* Code Rule 56.1 Stmt. ¶ 27; Pl. Rule 56.1 Stmt. ¶ 27.) In late October 2003, however, a representative from the Pennsylvania Department of Environmental Protection (the "PADEP") conducted a site inspection and found that the material could no longer be accepted by AS&M. (*See* Code Rule 56.1 Stmt. ¶ 12; Pl. Rule 56.1 Stmt. ¶ 12.) The PADEP ultimately determined that the material was "dredge material," or "residual waste," the acceptance of which violated AS&M's general permit, which allowed it to accept only "clean-fill," or "safe-fill," material.[7] (*See* Code Rule 56.1 Stmt. ¶ 13; Pl. Rule 56.1 Stmt. ¶ 13.) Although the 26 loads which were previously accepted by AS&M were allowed to remain at its facility, AS&M ceased further acceptance of the material. (*See* Code Rule 56.1 Stmt. ¶¶ 26-27; Pl. Rule 56.1 Stmt. ¶¶ 26-27.)

Creative attempted to continue the dredging in November, but without another disposal site, it had no place to store the removed sediment and was forced to cease dredging after November 11, 2003. (*See* Harris Dep. at 59-60, 69-70, 80-82.) Code and Alliance attempted to secure an alternate site for disposal of the material on Creative's behalf. (*See* Code Rule 56.1 Stmt. ¶ 14; Pl. Rule 56.1 Stmt. ¶ 14.) Because Code and Alliance were unsuccessful, Creative contracted directly with Clean Earth for transport and disposal of the material.[8] (*See* Code Rule 56.1 Stmt. ¶¶ 14-15; Pl. Rule 56.1 Stmt. ¶¶ 14-15.) Clean Earth agreed to accept the material for processing at its Claremont Dredge

---

[7] The terms "clean-fill" and "safe-fill" refer to waste material meeting certain chemical safety standards under Pennsylvania law. (*See* Code Mem. Supp. Summ. J., Ex. C.)

[8] Prior to submitting its bid to the City for the project, Creative obtained a quote from Clean Earth to transport and dispose of the Marina sediment, which Creative used in its bid to the City. (*See* Pl. Rule 56.1 Stmt. ¶ 2.)

Material Processing Facility, with disposal at its FDP Enterprises facility, both located in New Jersey. (*See* Pl. Rule 56.1 Stmt. ¶ 23.) Clean Earth obtained the approval of the New Jersey Department of Environmental Protection on November 24, 2003, but the facility could not accept the sediment until December 3, 2003. (*See id.*) In the interim, the City sent Creative a letter dated November 24, 2003 indicating that Creative failed to maintain the schedule for dredging and failed to comply with the terms of the parties' contract. (*See* New Rochelle Mem. Supp. Summ. J., Ex. 55.) Creative responded by letter dated December 1, 2003, stating that it was not "responsible for delays, caused by third parties, which are outside [its] control." (*See id.*, Ex. 56.)

On December 1, 2003, Creative contracted with Rainbow to transport the Marina sediment and with Clean Earth to dispose of it. (See *id.*, Exs. 57, 58.) Dredging recommenced on December 3, 2003, but was again discontinued in early January 2004 because of extremely cold temperatures. (*See id.*, Ex. 51; New Rochelle Rule 56.1 Stmt. ¶¶ 152, 153.) At the time of the second stoppage, Creative had removed 5,963 cubic yards of material from the Marina. (*See* New Rochelle Mem. Supp. Summ. J., Ex. 61.) Creative sought progress payments from the City on October 8, 2003, December 1, 2003, December 15, 2003, December 31, 2003, January 5, 2004, March 9, 2004 and March 15, 2004. (*See id.*, Ex. 62.) Creative was paid each time with the exception of the last payment request on March 15, 2004, which the City withheld because of the delay. (*See* New Rochelle Rule 56.1 Stmt. ¶ 158.) Creative alleges that "[a]s a direct result of Code's negligence in failing to recognize that the New Rochelle dredge material could not be disposed of at the Alliance site, and as a further result of Code being unable to secure an alternate site to fulfill its obligation to Creative, Creative was unable to complete the New Rochelle dredging project within the time

6

allowed and suffered significant financial loss." (Pl. Rule 56.1 Stmt. ¶ 28.)[9]

## II.    Code's First Summary Judgment Motion

On January 31, 2006, Code moved for summary judgment, arguing that the contract between Creative and Code was conditioned on the continuing acceptance by AS&M of the material dredged from the Marina, and "[w]hen AS[&]M ceased to accept the material, the duty of Code to transport and dispose of the material ceased as well." (*See* Code Mem. Supp. Summ. J. at 10.) Therefore, Code concluded that it did not breach the contract and, accordingly, it is entitled to payment for the work performed under the contract during the time AS&M was accepting the material. (*See id.* at 10, 14.) Creative, on the other hand, argued that the acceptance of the material by AS&M was not a condition of the contract because the Proposal was not incorporated into the contract between Creative and Code. (*See* Pl. Mem. Opp. Summ. J. (filed February 21, 2006) at 6-7.) Creative claimed that incorporation of the Proposal was prohibited because (1) the contract was formed two months after the Proposal and (2) the integration clause of the contract precludes written proposals prior to the execution of the contract from becoming part of the contract. (*See id.*) Creative concluded, therefore, that Code "failed to meet its burden of establishing a *prima facie* entitlement to summary judgment . . . ." (*See id.* at 6.) We denied summary judgment.

## III.    Prior Opinion Dated April 21, 2006

In our prior Opinion, we concluded that the Proposal was incorporated into the contract

---

[9] Code's Rule 56.1 Statement contains two paragraphs labeled twenty-eight, and since Creative's mirrors Code's statement, Creative's Rule 56.1 Statement does as well.

7

between Creative and Code because the contract expressly provided that the project would be performed pursuant thereto. *See Creative Waste Mgmt.*, 429 F. Supp. 2d at 603. Accordingly, we held that acceptance of the material by AS&M was a condition of the agreement between Code and Creative. *See id.* The parties have accepted this as the law of the case for the purposes of the present motion.

We found, however, that "the parties had a different understanding of what would meet the requirements of 'facility acceptance.'" *Id.* We explained that the second Sept. 4, 2003 letter by Alliance to Code "unambiguously states what the Alliance facility can accept[,]" but that "[i]t is unclear whether Creative ever received *this* letter." *See id.* We held:

> Although facility acceptance was a condition of the agreement between Code and Creative, it is clear that the parties had a different understanding of what would meet the requirements of "facility acceptance." It remains unclear whether this warrants recission based on mistake. Further factual development at trial is necessary to determine this issue.

*Id.* Accordingly, we denied Code's motion for summary judgment in its entirety. *See id.* at 603-04.

**IV.   Code's Present Summary Judgment Motion**

Code now submits "additional evidence [which it claims] unequivocally resolves in Code's favor the factual issue found by the court to preclude summary judgment . . . ." (Code Mem. Supp. Suppl. Summ. J. at 2). In particular, Code maintains that "[t]he only question of fact this Court felt remained concerning Creative's breach of contract claim in Code's Original Motion was this Court's impression that Code and Creative had different understandings of what would meet the requirements of 'facility acceptance.'" (*Id.* at 3.) Code asserts that the Court "emphasized that the second September 4, 2003 letter 'unambiguously state[d] what the Alliance facility can accept[,]"

but "the [C]ourt stopped short of granting summary judgment in Code's favor, finding that it was 'unclear whether Creative ever received *this* letter.'" (*See id.* at 3 (quoting the Court's prior Opinion).) Code now argues that the "additional evidence plainly shows that Creative unequivocally received th[e] second . . . letter before it entered its contract with Code." (*Id.* at 4.)

Code attaches two copies of the second Sept. 4, 2003 letter. The first attached copy is dated October 2, 2003 and is enclosed under Alliance's facsimile cover sheet addressed to Code, carbon copying Creative Waste. (*See id.*, Ex. D.) The second attached copy is also dated October 2, 2003 and is enclosed under Creative Waste's own facsimile cover sheet addressed to the City of New Rochelle.[10] (*See id.*, Ex. E.) The cover sheet indicates that eleven pages are included, which would be the exact amount if it were in fact enclosing the second letter. (*See id.*)  It also contains the following message: "John, Additional info on PA site per our discussion." (*See id.*).

Code argues that "these fascimiles prove beyond a doubt that not only did Creative have a copy of the second September 4, 2003 letter and its Tables, but [that it] discussed this letter with the City of New Rochelle before forwarding the documents to them." (*Id.* at 4.). With these facsimiles, Code concludes that "there is no doubt that Creative ever received the letter and was aware of the facility's acceptance criteria, and that the parties did indeed have the same understanding as to the requirements for 'facility acceptance.'" (*Id.*)

Creative, in response, asserts three arguments.  First, Creative argues that even if it did receive a copy of the letter, Code is still required to indemnify Creative for all loss caused by Code's

---

[10] Specifically, it is addressed to John Clemente from the City. (*See* Code Mem. Supp. Suppl. Summ. J., Ex. E.)

9

breach of contract.[11] (*See* Pl. Mem. Opp. Suppl. Summ. J. at 5-6.) Specifically, Creative contends that it was Code's obligation to know that dredge material was considered "'residual waste' and could not be [lawfully] accepted at the Alliance site." (*See id.* at 5.) In support of its contention, it emphasizes that the contract provides that Code, "in the performance of the work[,] will comply with all rules, regulations, laws and ordinances of any governmental agency applicable to said work." (*Id.* at 5-6; *see also* Pl. Aff., Ex. 2.) Second, Creative argues that even if Creative received the letter, Code is still required to indemnify Creative for all loss caused by Code's negligence. (*See* Pl. Mem. Opp. Suppl. Summ. J. at 6-9.) Creative contends that Code was negligent in failing "to know or discover that under existing PADEP guidelines governing its activities, the New Rochelle dredge material could not qualify as 'clean fill' and, therefore, could never be accepted at the Alliance disposal site . . . ." (*See id.* at 9.) Third, it claims that Code has failed to prove that Creative actually received the second Sept. 4, 2003 letter. (*See id.* at 9-12.) However, as Code notes in its Reply Memorandum, Creative's counsel produced the letter prior to any discovery outside the Pennsylvania litigation in which only Creative, Capitol and Code were parties. (*See* Code Reply Mem. Supp. Suppl. Summ. J. at 4-5.) Accordingly, Code moves for summary judgment on the basis that Creative's possession of the second letter removes any doubt as to the parties' understanding of the term "facility acceptance," which resolves the only genuine issue of material fact precluding summary judgment.

---

[11] As noted, the indemnification clause provided that Code "will indemnify, hold harmless and defend [Creative] against any and all damages suffered by [Creative] arising out of [Code's] breach of th[e] agreement or which [Creative] is compelled to pay any third person due to [Code's] willful misconduct or sole negligence." (*See* Pl. Aff., Ex. 2.)

10

# DISCUSSION

**I.     Standard of Review**

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and in deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. Nevertheless, to defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**II.    Interpretation of "Facility Acceptance"**

This is a dispute over the interpretation of a contract, and "[u]nder New York law,[12] 'the initial interpretation of a contract "is a matter of law for the court to decide."'" *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *K. Bell Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996))). "The key inquiry at this initial interpretation stage is

---

[12] We held in our prior Opinion that New York law applies, which the parties do not dispute. *See Creative Waste Mgmt.*, 429 F. Supp. 2d at 597 n.17.

whether the contract is unambiguous with respect to the question disputed by the parties." *Id.* "In assessing ambiguity, we consider the entire contract to 'safeguard against adopting an interpretation that would render any individual provision superfluous.'" *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)); *see also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003))). "Contract terms are not ambiguous if they 'have a definite and precise meaning and are not reasonably susceptible to differing interpretations.'" *Id.* (quoting *Sayers*, 7 F.3d at 1095). In other words, "[a] contract is not ambiguous where there is no reasonable basis for a difference of an opinion." *Red Rock Commodities Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 424 (2d Cir. 1998).

"In such cases, courts may not consider extrinsic evidence of the parties' intent." *Faulkner v. Nat'l Geographic Soc'y*, No. 97 Civ. 9361, 2006 WL 2666308, at *3 (S.D.N.Y. Sept. 18, 2006). Rather, courts must determine "the meaning of the contract 'from the terms expressed in the instrument itself.'" *Id.* at *3 (quoting *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.")). In the event that the contract is unambiguous, summary judgment may be appropriate. *See Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("The proper interpretation of an unambiguous contract is a question of

law for the court, and a dispute on such an issue may properly be resolved by summary judgment."); *Faulkner*, 2006 WL 2666308, at *3. If, however, the contract is ambiguous, the court must look at extrinsic evidence, and determine whether a genuine issue of material fact exists as to the meaning of the contract. *See id.*

In the present case, we must determine whether the phrase "facility acceptance" is ambiguous. First, the term "facility" clearly refers to the disposal sites, as the contract exclusively uses this term to indicate the physical location where the disposal of the sediment from the Marina would take place. *See Miller v. Hekimian Labs., Inc.*, 257 F. Supp. 2d 506, 516 (N.D.N.Y. 2003) (noting that courts must interpret contractual terms in the context of the entire contract), *aff'd*, 85 F. App'x 266 (2d Cir. 2004). Second, the term "acceptance" is defined by Webster's as "the act of accepting," which is defined as "to receive willingly . . .[;] to be able or designed to take or hold . . .[;] to give admittance or approval to . . . ."[13] *See Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 71 (2d Cir. 1999) (referring to Webster's Dictionary in finding that a certain term was unambiguous). Thus, the term "facility acceptance" clearly refers to the disposal site's acceptance or agreement to accept the material dredged and transported from the Marina. The terms, conditions and objective of the contract support this finding, which comports with the plain meaning of the term as used in the contract as well as common sense. *See Shepley*, 174 F.3d at 70 ("'Courts may not create an ambiguity where none exists.'").[14]

---

[13] *See* MERRIAM-WEBSTER ONLINE, http://www.m-w.com/dictionary/accept.

[14] We note that the parties in both the first and second summary judgment motions fail to provide any evidence of the custom and usage of the relevant industry. *See Int'l Multifoods Corp.*, 309 F.3d at 87 n.4 (finding that the district court "erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed"). In any event, in the present case, the plain meaning of this phrase within the context of the terms,

While there may have been some misunderstanding between the parties, including what, in particular, the disposal facilities would accept, no ambiguity exists as to the meaning of "facility acceptance." In other words, a logical distinction exists between "facility acceptance" and what specifically the facilities would accept. If the parties intended a more expansive definition of "facility acceptance," they would have said so. *See RJE Corp.*, 329 F.3d at 314 (declining to include "environmental liabilities" within the definition of "fair market value of the Pipeline System" when, *inter alia*, the parties did not expressly do so). Indeed, if this Court were to encompass, for example, the facilities' specific criteria for acceptance within the definition of "facility acceptance," we would run the risk of rendering other conditions of the contract superfluous, including, for example, the conditions that all materials be non-hazardous and pass a paint filter test.[15] *See LaSalle Bank*, 424 F.3d at 206 ("[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quoting *Shaw Group*, 322 F.3d at 124); 11 WILLISTON ON CONTRACTS § 32:5 (noting that contracts should not be interpreted to render a portion of the writing superfluous). Thus, "facility acceptance" is not ambiguous, and we are not permitted to examine extrinsic evidence to aid in its interpretation. *See Omni Quartz*, 287 F.3d at 64. Accordingly, upon AS&M's rejection of the material, a condition of the contract ceased to be satisfied.

---

conditions and objective of the contract "is so clear as a matter of ordinary meaning that evidence of industry practice ultimately cannot alter the apparent plain meaning of the language . . . ." *Id.*

[15] (*See* Pl. Aff., Ex. 1.)

**III.     Whether the Indemnification Clause Precludes Summary Judgment**

Code argues that summary judgment is warranted because, when the condition of "facility acceptance" ceased to be satisfied, it was no longer obligated to perform under the contract. (Code Mem. Supp. Suppl. Summ. J. at 5-6.)  In response, Creative argues that the contract obligated Code to "indemnify, hold harmless and defend [Creative] against any and all damages suffered by [Creative] arising out of [Code's] breach of th[e] agreement or which [Creative] is compelled to pay any third person due to [Code's] willful misconduct or sole negligence."  (Pl. Mem. Opp. Suppl. Summ. J. at 5-6.)   In particular, Creative emphasizes that Code was contractually obligated to "comply with all rules, regulations, laws and ordinances of any governmental agency applicable to [its] work." (*Id.*)  Consequently, Creative contends that "Code was contractually obligated to know or determine exactly what constituted 'clean fill' and that the New Rochelle dredge material was 'residual waste' that could not be disposed of at the Alliance site." (*Id.* at 6.)  Creative now argues that Code was negligent in failing to learn that the dredge material could not be disposed of at AS&M and that the contract requires it to indemnify Creative for all damages resulting from such negligence.[16]  However, Creative's Second Amended Complaint fails to state a claim for indemnification and makes no allegation of negligence.  Moreover, the indemnity clause of the contract was apparently intended to shield Creative from liability to third persons injured as a result of Code's "sole negligence" in performing the contract and not as a guarantee that Code would find

---

[16] Code, in response, argues that "[o]ne cannot be 'indemnified' under the terms of a contract for damages alleged to have resulted from conduct that takes place or fails to take place *after the contract has been nullified*."  (Code Reply Mem. Supp. Suppl. Summ. J. at 3.)  Code's argument misses the mark, however, because the harmful conduct to which Creative is referring occurred when Code selected AS&M as a disposal facility – well before AS&M ceased acceptance of the material dredged from the Marina.

a facility that would accept the material.

Under New York law, "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491, 548 N.E.2d 903, 905 (1989). Indeed, the promise to indemnify "should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." *Id.* at 491-92, 905. In *Hooper*, the court was faced with interpreting an indemnification clause requiring the defendant to indemnify the plaintiff "from any and all claims, damages, liabilities, costs and expenses, *including reasonable counsel fees* arising out of . . . any breach by [the defendant] of any express or implied warranty hereunder and express representation or provision hereof . . . ." *Id.* at 490, 904. The plaintiff argued that this provision obligated the defendant to indemnify the plaintiff for attorney fees arising out of litigation between the plaintiff and the defendant. *Id.* The court explained that "[i]nasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is *unmistakably clear from the language of the promise*." *Id.* at 492, 905 (emphasis added). The court added that applying the indemnification clause to litigation between the plaintiff and the defendant would render other clauses meaningless, s*ee id.* at 492-93, 905, and held that the provision did not extend to attorney's fees arising from litigation between the parties because it did "not contain language clearly permitting" such an application. *Id.* at 492, 905.

Similarly, in the present case, Creative provides no evidence that the indemnification clause

should apply in the event that AS&M rejected the material because it lacked the proper permits under Pennsylvania law.  Having not been presented with any evidence of the parties' intent, we decline to interpret this boilerplate indemnification clause to apply to the highly specific situation presently at issue, particularly in light of the fact that such interpretation would undercut the "facility acceptance" provision which was clearly intended by the parties.  *See id.* at 491, 905 ("Although the words might 'seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view . . . .'") (internal citations omitted).

Accordingly, Code's motion for summary judgment dismissing Creative's claim against Code for breach of contract is granted.

### IV.  Code's Counterclaim Against Creative for Breach of Contract

Code asserts a counterclaim against Creative for breach of contract seeking payment for its services performed prior to AS&M ceased acceptance of the material.  Creative concedes that it has not paid Code for its services, because the money owed by Code to Creative for Code's alleged breach of contract far exceeds the amount Creative owes Code for its performance under the contract.  (*See* Pl. Rule 56.1 Stmt. ¶ 28.)  In light of our decision to dismiss Creative's breach of contract claim against Code, Code is under no obligation to pay Creative and is therefore entitled to payment for its services which it performed prior to the termination of the contract.  Accordingly, Code's motion for summary judgment on its counterclaim against Code for breach of contract is granted, as to liability.

### CONCLUSION

For all of the foregoing reasons, Code Environmental Services, Inc.'s motion for summary

judgment dismissing Creative Waste Management Inc.'s claim against Code for breach of contract is granted, and Code's motion for summary judgment on its counterclaim against Creative for breach of contract is granted as to liability.

SO ORDERED.

Dated: White Plains, New York
      November 2, 2006

*William C. Conner*
Sr. United States District Judge